NO. 4-06-0353          Filed 1/19/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Greene County |
| ROBERT W. WEAR | ) | No. 06DT1 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | James W. Day, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

Defendant, Robert W. Wear, moved for reconsideration of an order in which the trial court denied his motion to rescind the summary suspension of his driver's license and his motion to suppress evidence and quash his arrest for driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2004)). The court granted the motion for reconsideration, and the State appeals.

Because the State nol-prossed the DUI case after the granting of the motion for reconsideration, we dismiss the portion of this appeal pertaining to the suppression of evidence and quashing of the arrest (an interlocutory ruling that vanished with the criminal case). As for the rescission of the summary suspension, case law deems that ruling to have occurred in a civil proceeding separate and distinct from the DUI case; there-fore, the nolle prosequi had no effect on that ruling, which is

appealable as a final judgment. In reliance on the doctrine of hot pursuit, we reverse the trial court's rescission of the summary suspension of defendant's driver license.

## I. BACKGROUND

The charging instrument was a citation and complaint, i.e., a traffic ticket, alleging that defendant committed the DUI in White Hall on January 2, 2006, at 12:52 a.m. On that date, the arresting police officer, Christopher Dawdy, served upon defendant a notice of the summary suspension of his driver's license for refusing to submit to a chemical test. See 625 ILCS 5/11-501.1(f) (West 2004). The DUI case was docketed as People v. Wear, case No. 06-DT-1. A receipt shows that on January 3, 2006, defendant posted bond in the amount of $100.

On January 20, 2006, defendant filed a motion to rescind the summary suspension. The grounds of the motion were twofold: (1) he "was not properly placed under arrest for [DUI,]" and (2) Dawdy lacked reasonable grounds to believe he had been driving, or in actual physical control of, a motor vehicle on a public highway while under the influence of alcohol or drugs.

On January 24, 2006, defendant filed a motion to suppress evidence and quash his arrest on the following grounds:

"6. The arrest herein occurred as a result of a warrantless, nonconsensual entry

- 2 -

into the residence at 303 Fulton Street, White Hall, Illinois[,] by the arresting officer, without probable cause to arrest and without the presence of any circumstances to excuse the requirement of probable cause or a warrant to enter the residence ***.

7. As a result of the arresting officer's unlawful, warrantless entry into the residence, the officer made certain observations of the [d]efendant and had certain conversations with the [d]efendant inside the residence, and subsequently outside the residence, which the defendant anticipates will be used against him at trial."

On February 10 and 17, 2006, the trial court held an evidentiary hearing on defendant's two motions. Defendant called Dawdy, who testified that on January 2, 2006, at 12:52 a.m., he was driving his squad car west on West Lincoln Street, where the speed limit was 30 miles per hour, when an eastbound white Cadillac traveling fast--"at least 40 [miles per hour]"--swerved toward him, forcing him to pull off to the shoulder of the street to avert a head-on collision. Dawdy turned around and pursued the Cadillac, which crossed Main Street and continued east on East Lincoln Street, still swerving from side to side. When the

Cadillac turned south onto Bates Avenue without using a turn signal, Dawdy (by then, no more than a car's length behind) turned on the flashing red and blue lights on the roof of his squad car.  He followed the Cadillac five or six more blocks.  Bates Avenue became Israel Street.  Continuing south down Israel Street, the Cadillac coasted through an intersection, disobeying a stop sign.  It stopped at the next stop sign and turned east onto East Carlinville Street.  Then it turned into the driveway of a house at the intersection of East Carlinville and Fulton Streets.  Dawdy pulled in behind the Cadillac and got out of his squad car at the same time defendant got out of the Cadillac.

Dawdy testified that he ordered defendant to get back into the car but defendant ignored him and began walking toward the house, staggering, swaying, and crossing his feet.  Dawdy followed him to the house, ordering him over and over again to get back in his car, but defendant kept on walking without so much as acknowledging Dawdy's presence.  A woman opened the door of the house and asked what was going on.  "I told her that I had been following [defendant] down Bates [Avenue] with my lights on[] and he wouldn't pull over."  Defendant stepped into the threshold, stood beside the woman, and, for the first time, spoke to Dawdy, who was standing less than a foot away, on the porch: defendant told him, "['I] made it home.[']"  Dawdy smelled alcohol on his breath.  Defendant then retreated into the house,

- 4 -

and without asking for permission, Dawdy followed him inside, demanding his identification--a demand that defendant refused because, as he insisted, he had "made it home." Dawdy asked defendant where he had come from; "Hillview Tavern," defendant replied. Dawdy twice asked him to come outside and take a field sobriety test; he refused. "[Defendant] stated to me that he didn't want to do field sobriety, that he's done it in the past and it hasn't helped him." At that point, Dawdy decided to place defendant under arrest. He handcuffed him and took him outside. In the squad car, Dawdy asked him to take a preliminary breath test; defendant refused. Dawdy took him to the Greene County sheriff's department, which had an officer certified to administer a Breathalyzer test. Warned by Dawdy of the consequence of refusal, defendant refused to take a Breathalyzer test, resulting in the summary suspension of his driver's license for six months.

Defendant also called the woman who tended bar at Hillview Tavern the evening of January 1, 2006, as well as two of the men with whom he played billiards there that evening. According to them, defendant did not appear to be drunk while he was in their presence from 8:30 to 11:30 p.m., and his speech and balance were unimpaired.

Patricia Foiles testified that the house on Fulton Street was her residence and defendant was her boyfriend. When he pulled into her driveway after midnight on January 2, 2006,

- 5 -

she was expecting him to stay overnight, as he customarily did. In her opinion, he displayed no symptoms of intoxication; he was walking and talking just fine.

Defendant testified he remembered drinking only three beers during his three-hour stay at the tavern, and he knew his faculties were unimpaired because, at the pool table, he was at the top of his game. He denied drinking before he went to the tavern or after he left. He was weaving on the road not because of intoxication but to avoid potholes and manhole covers, which might have damaged his old and fragile Cadillac. The Cadillac had a narrow rear window, and the first time he noticed the flashing lights of a squad car behind him was at the intersection of Israel Street and East Carlinville Street. Because (to his knowledge) he had done nothing wrong, he assumed the squad car was on some errand other than pulling him over. When he turned onto East Carlinville Street, he expected the squad car to keep going. His girlfriend's house was only "a short block" away from that intersection. He was unaware the squad car pulled into the driveway behind him. In fact, he was oblivious to Dawdy's presence until he entered the house and, sensing someone behind him, turned around and saw him standing there. He admitted refusing to take a Breathalyzer test.

Initially, on February 24, 2006, the trial court denied the motions to rescind the summary suspension and to suppress

evidence and quash the arrest.  Believing Dawdy's testimony over defendant's, the court  found that "the arrest [of defendant] commenced in a public place" and that under United States v. Santana, 427 U.S. 38, 42-43, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406, 2409 (1976), he "could not thwart his lawful arrest by retreating into his girlfriend's residence."

On March 2, 2006, defendant filed a motion to reconsider both rulings.  He pointed out that according to Dawdy's own testimony, Dawdy did not form an intent to arrest defendant until after he followed defendant into the house; thus, the arrest was not "set in motion in a public place" (Santana, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410).  For that reason, defendant argued, Santana was inapplicable.  The court evidently agreed with this argument, for on April 5, 2006, it made the following docket entry:  "After considering the arguments of counsel at the hearing on the [m]otion to [r]econsider, the court grants the [m]otion to [r]econsider [its] [r]uling.  Petition to [r]escind [s]tatutory [s]ummary [s]uspension is granted[,] and the [m]otion to [q]uash [a]rrest is granted."

When the trial court granted defendant's motion for reconsideration, the circuit clerk completed and signed a notice to the Secretary of State, as required by section 2-118.1 of the Illinois Vehicle Code (625 ILCS 5/2-118.1 (West 2004)).  The form states that "[u]pon the conclusion of the hearing, the [c]ircuit

- 7 -

[c]ourt found in favor of [defendant]" and rescinded the summary suspension of driving privileges because "[n]o [r]easonable [g]rounds" existed for the suspension.

On April 10, 2006, the trial court held a previously scheduled pretrial hearing in case Nos. 06-DT-1 and 06-TR-9. (In the latter case, defendant was charged with failing to use a turn signal.) The transcript of the hearing consists of one page, which we quote in full:

"THE COURT: What do you have next, Mr. Goetten [(State's Attorney)]?

MR. GOETTEN: Judge, this is People of the State of Illinois vs. Robert Wear, [case] No[s]. 06-DT-1[] [and] 06-TR-9. Your Honor, you had previously--I believe last week, had ruled on the [m]otion to [r]econsider in the [d]efendant's favor. I guess we're here today to dispose of the matter. I didn't know, and I'm not sure if Mr. Turpin [(defense counsel)] knows[:] [W]as that as to [case No.] 06-DT-1 for sure[?] [Case] No. 06-TR-9 was also part of defendant's motion.

THE COURT: No, it was only on [case No.] 06-DT-1. The court sees no reason to suppress any evidence on the turn[-]signal

- 8 -

charge.

MR. TURPIN: Okay.

MR. GOETTEN: Judge, I believe it's the defendant's intent just to plead guilty to--[o]h, I'm sorry. I believe it's the defendant's intent just to plea[d] guilty to that improper turn signal and pay the $75 over the counter, Judge.

MR. TURPIN: That is correct, [Y]our Honor.

THE COURT: That's fine.

(Defendant signs plea of guilty [(presumably, on the back of the traffic ticket in case No. 06-TR-9).])"

Using a preprinted form, the trial court wrote the following order (we indicate the filled-in blanks with underlining):

"CAUSE CALLED FOR:

* * *

X Pretrial Conference.

    X Negotiated [p]lea presented and approved ([s]ee Sentencing)[.] Written plea of guilty filed.

    ***

- 9 -

X Other.  [Case No.] 06[-]DT[-]1--arrest previously quashed--Defendant guilty to [case No.] 06[-]TR[-]9.

        ***

X Sentencing.  ***

        Defendant sentenced to

        ***  X Fine $75 incl[uding]*** costs.

        ***

X Other:  Bond to apply."

Also on April 10, 2006, the trial court made the following docket entry:  "Cause called for hearing.  Defendant present in person and by Attorney Turpin.  Arrest quashed in [case No.] 06-DT-1.  Cause stricken.  Defendant enters plea of guilty to [the charge in case No.] 06-TR-9.  Defendant fined $75.00 total.  Bond to apply.  Notice given to [d]efendant, State's Attorney[,] and Attorney Turpin in open court."

On the reverse side of the traffic ticket in case No. 06-DT-1, under the heading "Court Action and Other Orders" and the subheading "Findings," the circuit clerk placed an X in the box corresponding to "[n]olle [p]rosequi"; signed the line reserved for his signature; and, above the words "Date Order Entered," wrote April 10, 2006.

On April 27, 2006, the State appealed from the order of April 5, 2006, in which the trial court granted defendant's

- 10 -

motion to reconsider its rulings on the petition to rescind the summary suspension and the motion to suppress evidence and quash the arrest. This is the appeal before us. On July 27, 2006, the State filed a certificate of impairment.

## II. ANALYSIS

### A. Defendant's Motion To Dismiss This Appeal

#### 1. The DUI Case

In People v. Zeigler, 106 Ill. App. 3d 783, 784, 436 N.E.2d 722, 723 (1982), the Second District held that after nol-prossing a case, the State could not appeal from an earlier order granting a motion for suppression of evidence therein, unless the State also appealed from the nolle-prosequi order or from an order denying a motion to vacate the nolle prosequi. See also People v. Wolsk, 118 Ill. App. 3d 112, 115, 454 N.E.2d 695, 698 (1983). Defendant argues we should dismiss this appeal because while the State appeals from the interlocutory order of April 5, 2006, granting his motion for reconsideration, the State does not appeal from the nolle-prosequi order; nor did the State move to vacate that order.

The State does not disagree with Zeigler's holding. Instead, it disputes the existence of the nolle prosequi in this case. At page C-3 of the appendix to his motion to dismiss this appeal, defendant includes a copy of the reverse side of the traffic ticket, wherein the circuit court certified that the

State had nol-prossed the DUI case. In its "Objection to Defendant's Motion To Dismiss," the State submits an affidavit by the circuit clerk, V. "Tunie" Brannan, stating as follows:

"2. In my capacity as [c]ircuit [c]lerk[,] I am required to maintain the records of the court.

3. [A]s a matter of record[-]keeping[,] each case is required to have a disposition.

4. [O]n April 5, 2006, a docket entry was entered by the Honorable James W. Day quashing the arrest and suppressing evidence in [case No.] 06-DT-1.

5. [M]y understanding of the result of the quashing of the arrest in [case No.] 06-DT-1 was that [the] same was dismissed by the court. As a result of that entry[,] I, V. 'Tunie' Brannan, marked the X by [']Nolle Prosequi['] (see [e]xhibit [No.] C-3 of the [a]ppellee's [m]otion to [d]ismiss [the] [a]ppeal) for the purpose of maintaining records in my office.

6. [A]t no time did I consult with the State's Attorney or the [j]udge in making a determination on this form, [e]xhibit [No.]

- 12 -

C-3 of the [a]ppellee's [m]otion to [d]ismiss [the] [a]ppeal, since this form was for the purpose of record[-]keeping in my office.

7. *** Exhibit [No.] C-3 of the [a]ppellee's [m]otion to [d]ismiss [the] [a]ppeal is not an official court ruling or official court disposition in this matter."

We note that June 2, 2006, the circuit clerk certified the record--including the complaint and citation, which are listed in a table of contents prepared by the circuit clerk.

Illinois Supreme Court Rule 612(g) provides that "insofar as appropriate," Rule 329 (Official Reports Advance Sheet No. 22 (October 26, 2005), R. 329, eff. January 1, 2006) shall "apply to criminal appeals." 177 Ill. 2d R. 612(g). Rule 329 provides as follows:

"The record on appeal shall be taken as true and correct unless shown to be otherwise and corrected in a manner permitted by this rule. Material omissions or inaccuracies or improper authentication may be corrected by stipulation of the parties or by the trial court, either before or after the record is transmitted to the reviewing court, or by the reviewing court or a judge thereof. Any

- 13 -

controversy as to whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by that court and the record made to conform to the truth.  If the record is insufficient to present fully and fairly the questions involved, the requisite portions may be supplied at the cost of the appellant.  If necessary, a supplemental record may be certified and transmitted.  The clerk of the circuit court shall prepare a bound and certified supplemental record which shall be filed in the reviewing court upon order issued pursuant to motion."  (Emphasis omitted.) Official Reports Advance Sheet No. 22 (October 26, 2005), R. 329, eff. January 1, 2006.

Traditionally, "[t]he action of the court [could] be shown only by the record kept by the clerk.  This record [could not] be impeached by the clerk himself, by the recollection of the judge, or his want of recollection as alleged in this case, or by any other evidence." People ex rel. Pirola v. Lyle, 329 Ill. 418, 421, 160 N.E. 742, 743 (1928).  As interpreted by the courts, Rule 329 modified that common-law rule to the extent of allowing affidavits to supply omissions in the record.  Paschen

Contractors v. Illinois State Toll Highway Authority, 225 Ill. App. 3d 930, 935, 590 N.E.2d 539, 542-43 (1992); People v. Miller, 190 Ill. App. 3d 981, 989, 548 N.E.2d 1, 6 (1989). In People v. Chitwood, 67 Ill. 2d 443, 448, 367 N.E.2d 1331, 1333 (1977), for example, the defendant told the trial court that he waived a jury and wished to have a bench trial--but "the waiver was inadvertently omitted from the record." Rule 329 allowed the State to amend the record with an affidavit that on a certain date, in open court, the defendant waived a jury. Chitwood, 67 Ill. 2d at 448, 367 N.E.2d at 1333.

The common-law rule remains in full force, however, when it comes to contradicting the contents of the record. Paschen Contractors, 225 Ill. App. 3d at 935, 590 N.E.2d at 542; People v. Sims, 244 Ill. App. 3d 966, 972-73, 612 N.E.2d 1011, 1019 (1993). Rule 329 contemplates correcting "inaccuracies" in the record (Official Reports Advance Sheet No. 22 (October 26, 2005), R. 329, eff. January 1, 2006), but one can do so only by reference to some other part of the record (Hartgraves v. Don Cartage Co., 63 Ill. 2d 425, 428, 348 N.E.2d 457, 458-59 (1976)). The supreme court has held:

> "Nunc pro tunc orders must be based upon definite and precise evidence in the record. [Citation.] The certainty of evidence must be assured without reliance upon the memory of

the judge or any other person, and a <u>nunc</u> <u>pro</u> <u>tunc</u> order cannot be based upon <u>ex</u> <u>parte</u> affidavits or testimony." <u>Beck v. Stepp</u>, 144 Ill. 2d 232, 239, 579 N.E.2d 824, 827 (1991).

In <u>Hartgraves</u>, 63 Ill. 2d at 427, 348 N.E.2d at 458, for example, during a trial, one of the 12 jurors sustained an injury and, as a consequence, could no longer serve on the jury. After an off-the-record discussion in chambers, the defendant's attorney moved, in open court, for a mistrial; the trial court denied the motion. <u>Hartgraves</u>, 63 Ill. 2d at 427, 348 N.E.2d at 458. The trial resumed, and the remaining 11 jurors returned a verdict for the plaintiff. <u>Hartgraves</u>, 63 Ill. 2d at 427-28, 348 N.E.2d at 458. The defendant's attorney filed a posttrial motion, in which he raised the denial of his motion for a mis-trial. <u>Hartgraves</u>, 63 Ill. 2d at 427, 348 N.E.2d at 458. In opposition to the posttrial motion, the plaintiff's attorney filed an affidavit to the effect that during the in-chambers discussion, the defendant's attorney stated he would formally object, on the record, to proceeding with less than 12 jurors but the judge should overrule the objection because--off the re-cord--he was willing to proceed with the trial. <u>Hartgraves</u>, 63 Ill. 2d at 427-28, 348 N.E.2d at 458. The defendant's attorney filed a counteraffidavit denying he said any such thing. <u>Hartgraves</u>, 63 Ill. 2d at 427, 348 N.E.2d at 458. The judge

stated he had a clear recollection of the in-chambers discussion and the defense counsel had indeed urged him to overrule the motion for a mistrial because he was willing to proceed without the twelfth juror.  Hartgraves, 63 Ill. 2d at 427, 348 N.E.2d at 458.  Accordingly, the court denied the posttrial motion. Hartgraves, 63 Ill. 2d at 427, 348 N.E.2d at 458.

The defendant appealed, the appellate court reversed and remanded, and the supreme court affirmed the appellate court. Hartgraves, 63 Ill. 2d at 427, 348 N.E.2d at 458.  The supreme court held:  "[A]ny corrections of or additions to the record which contradict the clear and unambiguous contents of the record must be supported by something other than the 'clear memory' of the trial judge."  (Emphasis added.)  Hartgraves, 63 Ill. 2d at 432, 348 N.E.2d at 461.  That "something other" must be "'some note or memorandum from the record or quasi records of the court, or by the judge's minutes, or by the papers in file in the cause.'"  Hartgraves, 63 Ill. 2d at 428, 348 N.E.2d at 458, quoting Pinkstaff v. Pennsylvania R.R. Co., 20 Ill. 2d 193, 202, 170 N.E.2d 139, 144 (1960).

In his affidavit, the Greene County circuit clerk claims that the disposition on the back of the citation and complaint in case No. 06-DT-1 "is not an official court ruling or official court disposition in this matter."  We disagree. Illinois Supreme Court Rule 552 provides:  "A final disposition

- 17 -

noted on the reverse side of the 'Complaint' shall be evidence of the judgment in the case."  Official Reports Advance Sheet No. 22 (October 30, 2002), R. 552, eff. September 30, 2002.  The back of the traffic ticket says the case was nol-prossed on April 10, 2006.  In a hearing on that date, the State's Attorney told the trial court:  "I guess we're here today to dispose of the matter."  The docket entry for April 10, 2006, says "[c]ause stricken"--and that the State's Attorney was given "[n]otice" of this disposition "in open court."  The State's Attorney never moved to vacate the nolle prosequi and never suggested to the trial court that it misunderstood his intent.  Instead, on the strength of the circuit clerk's affidavit, the State now contends that--contrary to the "Court Action" in the traffic ticket; and contrary to the docket entry for April 10, 2006; and contrary to the State's Attorney's request to "dispose of the matter"--the case was, in fact, not nol-prossed.  This is an impeachment of the record, not the supplying of an omission.  We find that this case fits within the rule of Hartgraves rather than Chitwood. The circuit clerk's affidavit is inadmissible, and we deny the State's motion to add it to the record.  Defendant has moved to dismiss this appeal, and, on the authority of Zeigler, we grant the motion in part:  we dismiss this appeal insomuch as it challenges the suppression of evidence and quashing of the arrest, which were an interlocutory ruling in the nol-prossed

criminal case.

## 2. The Summary Suspension

The order from which the State appeals awarded defendant two forms of relief:  (1) it suppressed evidence and quashed the arrest in case No. 06-DT-1, and (2) it rescinded the statutory summary suspension of defendant's driver's license.  The first form of relief is moot; the second still presents a live issue.  "[S]tatutory summary suspension hearings are civil in nature and, thus, *** are separate and distinct from a criminal action for DUI."  People v. O'Connor, 313 Ill. App. 3d 134, 136, 728 N.E.2d 1175, 1177 (2000).  For that reason, "[t]he dismissal of a criminal charge does not result in an automatic rescission of the suspension."  (Emphasis in original.)  People v. Schaefer, 154 Ill. 2d 250, 257-58, 609 N.E.2d 329, 332 (1993).

Defendant argues that the appeal from the rescission of the summary suspension "should [also] be dismissed because it is a violation of the plea agreement," under which the State agreed to dismiss case No. 06-DT-1.  As we have explained, the dismissal of the DUI charge in case No. 06-DT-1 had no effect on the summary suspension, which was a separate civil proceeding.  Therefore, an agreement to dismiss the DUI charge would not reasonably imply a rescission of the statutory suspension.  "If disputed, the terms of the [plea] agreement are to be judged under objective standards" (People v. Navarroli, 121 Ill. 2d 516,

- 19 -

521, 521 N.E.2d 891, 893 (1988)), not by a party's subjective expectations (People v. Umfleet, 190 Ill. App. 3d 804, 811, 546 N.E.2d 1013, 1018 (1989)). The record appears to contain no objective evidence that the State agreed to the rescission of the summary suspension.

Whether the State agreed to the dismissal of the DUI charge in return for defendant's guilty plea and payment of the fine in case No. 06-TR-9 (as opposed to unilaterally nol-prossing the DUI charge) would be a question for the trial court to resolve should the State refile the DUI charge. See Navarroli, 121 Ill. 2d at 521-22, 521 N.E.2d at 893 (existence of a plea agreement and its terms and conditions are questions of fact which the trier of fact must determine; on appeal, we ask whether the determination is against the manifest weight of the evidence). For our purposes, suffice it to say the State nol-prossed case No. 06-DT-1 (but not, thereby, the already-concluded civil proceeding for summary suspension).

B. The Merits of the Rescission of the Summary Suspension

### 1. The Applicability of the Exclusionary Rule to This Civil Proceeding

In criminal cases, courts suppress evidence obtained as a result of an unreasonable search or seizure, provided that the causal link between the evidence and the unreasonable search or seizure is not too attenuated. People v. Pettis, 184 Ill. App. 3d 743, 751-52, 540 N.E.2d 1097, 1103 (1989), citing Wong Sun v.

<u>United States</u>, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 416-17 (1963); <u>Immigration & Naturalization Service v. Lopez-Mendoza</u>, 468 U.S. 1032, 1040-41, 82 L. Ed. 2d 778, 787, 104 S. Ct. 3479, 3484 (1984). "The reach of the exclusionary rule beyond the context of criminal prosecution, however, is less clear." <u>Lopez-Mendoza</u>, 468 U.S. at 1041, 82 L. Ed. 2d at 787, 104 S. Ct. at 3484. Summary-suspension proceedings are, as we have explained, "civil in nature" and "are separate and distinct from a criminal action for DUI." <u>O'Connor</u>, 313 Ill. App. 3d at 136, 728 N.E.2d at 1177. When deciding whether the exclusionary rule applies to a given civil case, the court must "weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs." <u>Lopez-Mendoza</u>, 468 U.S. at 1041, 82 L. Ed. 2d at 787, 104 S. Ct. at 3484.

In the present case, neither party questions the applicability of the exclusionary rule to a summary-suspension proceeding. See <u>People v. Krueger</u>, 208 Ill. App. 3d 897, 903-04, 567 N.E.2d 717, 721 (1991) (implying a requirement into section 2-118(b) of the Illinois Vehicle Code (625 ILCS 5/2-118.1(b) (West 2004)) that the arrest be lawful is necessary to save the statute from unconstitutionality). Therefore, we will proceed under the assumption that if Dawdy's warrantless, nonconsensual entry into Foiles's house was unreasonable, the summary suspension cannot stand.

## 2. Our Standard of Review

The parties disagree over our standard of review. According to the State, a motion for suppression of evidence presents a mixed question of law and fact: the trial court's factual findings deserve deference insomuch as they are not against the manifest weight of the evidence, but we decide de novo whether those factual findings call for a suppression of evidence. People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100-01 (2004). Defendant concedes that, "ordinarily," we should apply this dual standard when reviewing rulings on motions to suppress evidence. He contends, however, that because we are actually reviewing the granting of a motion for reconsideration, we should use a different standard of review. He cites a First District case for the following proposition: "'"The decision to grant or deny a motion for reconsideration lies within the discretion of the circuit court and will not be reversed absent an abuse of that discretion. [Citation.]"'" Avenaim v. Lubecke, 347 Ill. App. 3d 855, 861, 807 N.E.2d 1068, 1073 (2004), quoting Chelkova v. Southland Corp., 331 Ill. App. 3d 716, 729, 771 N.E.2d 1100, 1111 (2002). We likewise have held: "A trial court's decision on a motion to reconsider will not be disturbed absent abuse of discretion." Woolums v. Huss, 323 Ill. App. 3d 628, 639, 752 N.E.2d 1219, 1229 (2001); see also Weilmuenster v. Illinois Ben Hur Construction Co., 72 Ill. App. 3d 101, 105-106,

390 N.E.2d 579, 582 (1979).

These cases (prescribing an abuse-of-discretion stan-
dard of review for rulings on motions for reconsideration) are
civil cases, not criminal cases--but, one must bear in mind, we
are reviewing a civil proceeding.  The question, did the trial
court abuse its discretion? implies an attitude of deference.  We
have stated:

> "'"Abuse of discretion"' means clearly
> against logic; the question is not whether
> the appellate court agrees with the circuit
> court, but whether the circuit court acted
> arbitrarily, without employing conscientious
> judgment, or whether, in view of all the
> circumstances, the court exceeded the bounds
> of reason and ignored recognized principles
> of law so that substantial prejudice
> resulted.'"  Long v. Mathew, 336 Ill. App. 3d
> 595, 600-601, 783 N.E.2d 1076, 1080  (2003),
> quoting State Farm Fire & Casualty Co. v.
> Leverton, 314 Ill. App. 3d 1080, 1083, 732
> N.E.2d 1094, 1096 (2000).

If our standard of review in the present case were deferential,
we would simply ask whether the court abused its discretion,
instead of using a dual standard of review as in criminal cases.

- 23 -

Our mere disagreement with the court's ultimate conclusion as to whether the evidence should be suppressed would not warrant reversal; we would have to allow room for a reasonable difference of opinion.  Considering the United States Supreme Court's rationale for the dual standard of review, we conclude that deference on the ultimate question of the reasonableness of a seizure would be undesirable even in a civil case.

In Ornelas v. United States, 517 U.S. 690, 691, 134 L. Ed. 2d 911, 916, 116 S. Ct. 1657, 1659 (1966), the question before the Supreme Court was whether the court of appeals had used the correct standard when reviewing the trial court's findings of reasonable suspicion and probable cause.  The court of appeals opined that those findings "should be reviewed 'deferentially,' and 'for clear error'" (Ornelas, 517 U.S. at 691, 134 L. Ed. 2d at 916, 116 S. Ct. at 1659)--a term that the Supreme Court understood to be synonymous with an "abuse of discretion" (Ornelas, 517 U.S. at 694 n.3, 134 L. Ed. 2d at 918 n.3, 116 S. Ct. at 1661 n.3).  The Supreme Court agreed that a reviewing court should look with deference upon the trial court's findings of historical fact (Ornelas, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663), but, for three related reasons, the Court prescribed a de novo standard of review for the "ultimate determinations of reasonable suspicion and probable cause" (Ornelas, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at

- 24 -

1662).  First, a "policy of sweeping deference" would allow trial courts to draw opposite conclusions as to probable cause on essentially the same facts.  Ornelas, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662.  "Such varied results would be inconsistent with the idea of a unitary system of law."  Ornelas, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662. Second, "[i]ndependent review" enabled appellate courts "to maintain control of, and to clarify, the legal principles." Ornelas, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662.  Third, "de novo review tend[ed] to unify precedent and [would] come closer to providing law enforcement officers with a defined '"'set of rules which, in most instances, ma[de] it possible to reach a correct determination beforehand as to whether an invasion of privacy [was] justified in the interest of law enforcement.'"'"  Ornelas, 517 U.S. at 697-98, 134 L. Ed. 2d at 919-20, 116 S. Ct. at 1662, quoting New York v. Belton, 453 U.S. 454, 458, 69 L. Ed. 2d 768, 773, 101 S. Ct. 2860, 2863 (1981), quoting W. LaFave, "Case-By-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma, 1974 S. Ct. Rev. 127, 142 (1974).

We do not see how classifying a case as "civil" rather than "criminal" lessens the force of that threefold rationale if, in the civil case, the appellate court is developing precedent on the question of whether an invasion of privacy was constitution-

- 25 -

ally justified.  Although we normally review rulings on motions for reconsideration for an abuse of discretion, we decline to apply that policy of sweeping deference to this case.  Instead, we will apply the dual standard of review that the Supreme Court prescribed in Ornelas and which our own supreme court reaffirmed in Pitman, 211 Ill. 2d at 512-13, 813 N.E.2d at 101.

### 3. The Trial Court's Factual Findings, to Which We Defer

In the original order of February 24, 2006, denying defendant's petition to rescind the summary suspension of his driver's license, the trial court laid out the competing versions of fact from the evidentiary hearing--defendant's version on the one hand and Dawdy's version on the other--and found that "the controverted facts [had to] be resolved in favor of the State." In short, the court believed Dawdy over defendant.  The State argues we should defer to that factual determination.  See People v. Moss, 217 Ill. 2d 511, 517, 842 N.E.2d 699, 704 (2005).

Defendant does not claim that the factual findings in the trial court's original order were against the manifest weight of the evidence; he merely claims they were superseded.  In its order of April 5, 2006, granting defendant's motion for reconsideration, the court made no factual findings.  Defendant reasons that we must, therefore, "presume that the trial court found all issues and controverted facts in favor of the prevailing party, here, the defendant." People v. Lagle, 200 Ill. App. 3d 948,

- 26 -

954, 558 N.E.2d 514, 519 (1990); see also <u>National Acceptance Co. v. Pintura Corp.</u>, 94 Ill. App. 3d 703, 707, 418 N.E.2d 1114, 1118 (1981) ("Where as here, the judgment of the trial court is not accompanied by findings of fact, the presumption is that the trial court found all issues and controverted facts in favor of the prevailing party").

When interpreting a judgment, we strive to effectuate the trial court's intent, and, to that end, we interpret the judgment in the context in which the court rendered it. Part of that context is the pleading that sought the judgment. <u>Baldi v. Chicago Title & Trust Co.</u>, 113 Ill. App. 3d 29, 33, 446 N.E.2d 1205, 1208-09 (1983). Neither <u>Lagle</u> nor <u>National Acceptance Co.</u> dealt with a motion for reconsideration. A party can file a motion for reconsideration for one or more of the following reasons: (1) to inform the trial court of newly discovered evidence that was unavailable at the time of the original hearing, (2) to alert the court to changes in the law, or (3) to apprise the court of any errors it made in its application of existing law. <u>Kaiser v. MEPC American Properties, Inc.</u>, 164 Ill. App. 3d 978, 987, 518 N.E.2d 424, 429-30 (1987). In his motion for reconsideration, defendant presented no new evidence; he merely argued that the court erred in its application of existing law. Specifically, he argued that the court erred by applying the rule of <u>Santana</u> to this case because, unlike the arrest in

- 27 -

<u>Santana</u>, the one in this case had not yet "commenced" when Dawdy followed defendant into the house.  He further argued that the warrantless, nonconsensual entry of the house was unreasonable, given the lack of exigent circumstances.  Such being defendant's argument in his motion for reconsideration, we will not presume that the court had an unsolicited change of mind about the facts--that, for no apparent reason, it now chose to believe defendant over Dawdy without bothering to say so in the record.  Instead, we infer that while adhering to its previous factual findings, the court agreed with the legal argument that defendant made in his motion for reconsideration, and granted the motion on that basis.  We so interpret the judgment.

### 4. <u>Standing</u>

At trial, the State stipulated that defendant had a legitimate expectation of privacy in Foiles's residence and that he, therefore, had standing to claim the protection of the fourth amendment (U.S. Const., amend. IV).  The stipulation is justi-fied.  See <u>Minnesota v. Olson</u>, 495 U.S. 91, 96-97, 109 L. Ed. 2d 85, 93, 110 S. Ct. 1684, 1688 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expecta-tion of privacy in the home that society is prepared to recognize as reasonable").

### 5. <u>Fleeing</u> <u>into</u> <u>a</u> <u>Residence</u> <u>After</u> <u>the</u> <u>Commencement</u> <u>of</u> <u>an</u> <u>Investigatory</u> <u>Stop</u>

In <u>Santana</u>, 427 U.S. at 40, 49 L. Ed. 2d at 303, 96 S.

Ct. at 2408, the police had probable cause to arrest Santana for distribution of heroin.  Upon arriving at her house, they saw her standing in the doorway with a brown paper bag in her hand. Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408. They pulled up to within 15 feet of her and jumped out of the van, shouting "'police'" and holding up their identification. Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408. Santana retreated into her house, and the officers followed her, nabbing her in the vestibule.  Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408.  As she tried to pull away from them, packets of heroin spilled out of the bag.  Santana, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408.  They found the marked money in her pocket.  Santana, 427 U.S. at 41, 49 L. Ed. 2d at 304, 96 S. Ct. at 2409.  She moved to suppress the money and heroin because the police had no warrant.  Santana, 427 U.S. at 41, 49 L. Ed. 2d at 304, 96 S. Ct. at 2409.

The Supreme Court had previously held, in United States v. Watson, 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976), "that the warrantless arrest of an individual in a public place upon probable cause did not violate the [f]ourth [a]mendment." Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. Given that holding, the Supreme Court asked two questions in Santana.  The first question was "whether, when the police first sought to arrest Santana, she was in a public place."  Santana,

427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. The answer was yes. Standing in the threshold of her front door, she was in a public place for purposes of the fourth amendment. Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. She had no reasonable expectation of privacy in the doorway, "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. Thus, when the police, on the basis of probable cause, sought to arrest her in the open doorway, they were merely "perform[ing] a function which [the Court] ha[d] approved in Watson." Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409.

The second question was "whether [Santana's] act of retreating into her house could thwart an otherwise proper arrest." Santana, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. The answer was no. "[A] suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson, by the expedient of escaping to a private place." Santana, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410.

Before defendant retreated into the house, Dawdy set in motion an investigatory stop, not an arrest. Otherwise, this case resembles Santana. Having witnessed him turn without using a turn signal, Dawdy had probable cause to believe that defendant

- 30 -

violated section 11-804(b) of the Illinois Vehicle Code (Code) (625 ILCS 5/11-804(b) (West 2004)). For that reason alone, he had the right to pull defendant over. See People v. Shepherd, 242 Ill. App. 3d 24, 29, 610 N.E.2d 163, 166 (1993). He also saw defendant coast past a stop sign, an additional traffic violation (625 ILCS 5/11-904(b) (West 2004)). He "set the stop in motion" by turning on his flashing red and blue lights at the intersection of East Lincoln Street and Bates Avenue. Ignoring Dawdy's repeated commands to stop and go back into the car, defendant walked away from him and retreated into the house, giving Dawdy probable cause to believe that defendant had committed the offense of fleeing or attempting to elude a police officer (625 ILCS 5/11-204(a) (West 2004)). On West Lincoln Street, defendant swerved toward Dawdy at a high rate of speed, forcing Dawdy to pull over to the shoulder of the street to avoid a head-on collision. When Dawdy turned around and followed him, defendant was still swerving. Defendant made a wide turn onto Bates Street without using a turn signal. He failed to stop at a stop sign. He swayed and stumbled up the sidewalk, disobeying Dawdy's repeated orders to stop, and when he stood in the doorway (a public place, under Santana) and more or less said, "You're out of luck because I made it home," Dawdy smelled alcohol on his breath. At that point, "a person of reasonable caution" would have believed that defendant had committed DUI (People v. Sims,

- 31 -

192 Ill. 2d 592, 614, 736 N.E.2d 1048, 1060 (2000))--a belief that defendant evidently shared. Dawdy did not know defendant's blood alcohol level--he did not have scientific proof of intoxication--but "the evidence relied upon by the arresting officer[] does not have to be sufficient to prove guilt beyond a reasonable doubt"; it need not even prove that the defendant is more probably than not guilty (Sims, 192 Ill. 2d at 614-15, 763 N.E.2d at 1060). Dawdy had more than "mere suspicion." See Sims, 192 Ill. 2d at 614-15, 736 N.E.2d at 1060. While defendant was still in a public place, Dawdy had probable cause to arrest him for attempting to elude a police officer and for DUI.

But Dawdy did not form an intent to arrest defendant until after he followed defendant into the house. Thus, when defendant retreated into the house, Dawdy had not, as of yet, "set in motion" the arrest. See Santana, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410. He had, however, "set in motion" a Terry stop. See Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Like an arrest, a Terry stop is a seizure of the person (People v. Gonzalez, 204 Ill. 2d 220, 226, 789 N.E.2d 260, 264 (2003)); it is simply a less intrusive form of seizure (Illinois v. Wardlow, 528 U.S. 119, 126, 145 L. Ed. 2d 570, 577, 120 S. Ct. 673, 677 (2000)).

Does this distinction between the two types of seizure make Santana distinguishable? Defendant seems to think so but

does not explain why. According to the Second District, the doctrine of hot pursuit does not care whether it was a <u>Terry</u> stop or an arrest that the police officer set in motion before pursuing a suspect into a private place. In <u>People v. Rivera</u>, 233 Ill. App. 3d 69, 598 N.E.2d 423 (1992), the Aurora police had information that cocaine was stored in the basement of the defendant's bar, La Tropicana, and that he was trafficking in that drug. Two police officers, Renaud and Reichardt, entered the bar (<u>Rivera</u>, 233 Ill. App. 3d at 71, 598 N.E.2d at 424)--which, other than the basement, was a public place (<u>Rivera</u>, 233 Ill. App. 3d at 76, 598 N.E.2d at 428). They had no warrant. <u>Rivera</u>, 233 Ill. App. 3d at 71, 598 N.E.2d at 424. When the defendant saw Renaud approaching, he made a dash for the basement door, opened it, and ran downstairs. <u>Rivera</u>, 233 Ill. App. 3d at 71-72, 598 N.E.2d at 425. The officers pursued him. <u>Rivera</u>, 233 Ill. App. 3d at 72, 598 N.E.2d at 425. The defendant ran to an office in the basement, pushed the door open, and yelled "'police.'" <u>Rivera</u>, 233 Ill. App. 3d at 72, 598 N.E.2d at 425. In the basement office, a man named Wilkinson stuffed a bag into his mouth and would not spit it out. <u>Rivera</u>, 233 Ill. App. 3d at 72, 598 N.E.2d at 425. The police found a bag of cocaine in the defendant's pocket. <u>Rivera</u>, 233 Ill. App. 3d at 72, 598 N.E.2d at 425. The prior information the police had, together with the defendant's sudden flight, provided reasonable suspicion to stop

him pursuant to Terry.  Rivera, 233 Ill. App. 3d at 77, 598

N.E.2d at 428.  After reviewing authorities from other jurisdic-

tions, the Second District held as follows:

> "[T]he police, in certain limited cir-
> cumstances, may be authorized to make a
> warrantless entry into a private premises for
> the purpose of effectuating a Terry stop[,]
> provided the police have a lawful basis to
> stop a suspect in a public place and the
> suspect reacts by suddenly fleeing to a pri-
> vate sanctuary, thereby thwarting any oppor-
> tunity to conduct the detention at a public
> location."  Rivera, 233 Ill. App. 3d at 76,
> 598 N.E.2d at 427.

We find Rivera to be persuasive.  In fact, the State's

case here is stronger than in Rivera because when pursuing

defendant into the house, Dawdy had more than reasonable suspi-

cion for a Terry stop; he had probable cause to arrest defendant.

So this case is closer to Santana than Rivera.  If, on the basis

of probable cause, Dawdy had "set in motion" an arrest of defen-

dant outside Foiles's house and then followed him inside, Santana

would have been precisely applicable.  It must follow that if, in

reliance on the same probable cause, Dawdy "set in motion" a

Terry stop of defendant outside the house, he likewise could

- 34 -

follow defendant inside. "The Santana analysis, which supports the warrantless arrest of a suspect who has no legitimate expectation of privacy, a fortiori allows the lesser intrusion of a brief investigatory detention." (Emphasis in original.) United States v. Gori, 230 F.3d 44, 53 (2d Cir. 2000). We understand Santana to essentially stand for the following proposition: when the police commence a reasonable seizure of a person in a public place, that person cannot thwart the seizure by retreating into a private place. See Edwards v. United States, 364 A.2d 1209, 1214 (D.C. App. 1976), modified en banc, Edwards v. United States, 379 A.2d 976, 979 (D.C. App. 1977).

Defendant argues "there is no indication that [he] 'fled' into the house[;] rather, the evidence showed he merely got out of his car and walked into the house." The Supreme Court referred to the act of "escaping to a private place." Santana, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410. We do not see what difference it makes whether defendant sprinted, jogged, or walked up the sidewalk to Foiles's house; Dawdy was directly behind him, repeatedly ordering him to stop and get back into the car, and defendant ignored those commands and went into the house with the intent of escaping Dawdy and thwarting the investigatory stop. See State v. Paul, 548 N.W.2d 260, 265 (Minn. 1996). "'[H]ot pursuit'" means merely "some sort of a chase." Santana, 427 U.S. at 43, 49 L. Ed. 2d at 305, 96 S. Ct.

- 35 -

at 2410.

6. "Hot Pursuit" as an Exigent Circumstance Unto Itself

Defendant argues that Dawdy violated the fourth amendment by arresting him inside Foiles's home because Dawdy was aware of no "'exigent circumstances,'" within the meaning of Payton v. New York, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), and Welsh v. Wisconsin, 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984), to justify his warrantless, nonconsensual entry of the home.

In Payton, 445 U.S. at 588-89, 63 L. Ed. 2d at 652, 100 S. Ct. at 1381, the Supreme Court held that entering a home without a warrant or consent and arresting someone therein--even for a felony that the police had probable cause to believe the arrestee committed--was presumptively unreasonable under the fourth amendment, applicable to the states via the fourteenth amendment (U.S. Const., amend. XIV) (Payton, 445 U.S. at 576, 63 L. Ed. 2d at 644-45, 100 S. Ct. at 1374-75), and that the state could rebut this presumption of unreasonableness only by showing "'exigent circumstances'" (Payton, 445 U.S. at 589, 63 L. Ed. 2d at 652, 100 S. Ct. at 1381, quoting United States v. Reed, 572 F.2d 412, 423 (2d Cir. 1978)). The Supreme Court declined to "consider the sort of emergency or dangerous situation, described in [its] cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or

search" (<u>Payton</u>, 445 U.S. at 583, 63 L. Ed. 2d at 649, 100 S. Ct. at 1378), "thereby leaving to the lower courts the initial application of the exigent-circumstances exception" (<u>Welsh</u>, 466 U.S. at 749, 80 L. Ed. 2d at 743, 104 S. Ct. at 2097).

While no list of factors is exhaustive, our own supreme court has set out some factors that a court may take into account when assessing exigency in a particular situation. Those factors are as follows:

> "(1) whether the offense under investigation was recently committed; (2) whether there was any deliberate or unjustifiable delay by the officers during which time a warrant could have been obtained; (3) whether a grave of-fense is involved, particularly one of vio-lence; (4) whether the suspect was reasonably believed to be armed; (5) whether the police officers were acting upon a clear showing of probable cause; (6) whether there was a like-lihood that the suspect would have escaped if not swiftly apprehended; (7) whether there was strong reason to believe that the suspect was on the premises; and (8) whether the police entry, though nonconsensual, was made peaceably." <u>People v. Foskey</u>, 136 Ill. 2d

66, 75, 554 N.E.2d 192, 197 (1990).

In Welsh, 466 U.S. at 742, 80 L. Ed. 2d at 738, 104 S. Ct. at 2093, the Supreme Court considered whether "'exigent circumstances'" allowed the police to make "a warrantless night entry of a person's home in order to arrest him for a nonjailable traffic offense" of DUI. In that case, a motorist, Randy Jablonic, saw a car changing speeds and veering side to side until it swerved off the road and came to rest in an open field. Welsh, 466 U.S. at 742, 80 L. Ed. 2d at 738, 104 S. Ct. at 2093. Another passerby stopped at the scene, and Jablonic asked her to call the police. Welsh, 466 U.S. at 742, 80 L. Ed. 2d at 738, 104 S. Ct. at 2093-94. Before the police arrived, the driver of the car got out and walked home, leaving the car in the field. Welsh, 466 U.S. at 742, 80 L. Ed. 2d at 738, 104 S. Ct. at 2094. Without obtaining a warrant, the police entered the driver's home, found him lying naked in bed, and arrested him for DUI. Welsh, 466 U.S. at 743, 80 L. Ed. 2d at 738-39, 104 S. Ct. at 2094. The Supreme Court held that the "warrantless, nighttime entry into the petitioner's home to arrest him for a civil traffic offense" was "clearly prohibited by the special protection afforded the individual in his home by the [f]ourth [a]mendment." Welsh, 466 U.S. at 754, 80 L. Ed. 2d at 746, 104 S. Ct. at 2100.

"[A]n important factor to be considered when

- 38 -

determining whether any exigency exist[ed] [was] the gravity of the underlying offense for which the arrest [was] being made." Welsh, 466 U.S. at 753, 80 L. Ed. 2d at 745, 104 S. Ct. at 2099. Under Wisconsin law, no incarceration was possible for a first offense of DUI.  Welsh, 466 U.S. at 754, 80 L. Ed. 2d at 746, 104 S. Ct. at 2100.  The State claimed a potential emergency in the need to ascertain the driver's blood alcohol level.  Welsh, 466 U.S. at 753, 80 L. Ed. 2d at 745, 104 S. Ct. at 2099.  But considering that Wisconsin had "chosen to limit severely the penalties that [could] be imposed" (Welsh, 466 U.S. at 754 n.14, 80 L. Ed. 2d at 746 n.14, 104 S. Ct. at 2100 n.14), thereby designating the offense as a minor one, "mere similarity to other cases involving the imminent destruction of evidence [was] not sufficient" (Welsh, 466 U.S. at 754, 80 L. Ed. 2d at 746, 104 S. Ct. at 2100).

Unlike the state of Wisconsin in Welsh, Illinois does not limit the penalties for a first DUI:  it is a Class A misdemeanor (625 ILCS 5/11-501(b-2) (West 2004)), punishable by imprisonment for up to 364 days (730 ILCS 5/5-8-3  (West 2004)). Fleeing or attempting to elude a police officer also is a Class A misdemeanor.  625 ILCS 5/11-204(a) (West 2004).  Because Dawdy had probable cause to effect a seizure of the person for jailable offenses, Welsh is distinguishable.  More important, Welsh was not a case of hot pursuit, as the Supreme Court pointed out.

<u>Welsh</u>, 466 U.S. at 753, 80 L. Ed. 2d at 745, 104 S. Ct. at 2099.

We need not decide whether the factors in <u>Foskey</u> justify, on balance, Dawdy's warrantless, nonconsensual entry of Foiles's home; Dawdy was in hot pursuit of defendant and, for that reason alone, had the right to enter the house and arrest him. It appears that the majority of jurisdictions that have considered this question would so hold. D. Gilsinger, Annotation, <u>When Is Warrantless Entry of House or Other Building Justified Under "Hot Pursuit" Doctrine</u>, 17 A.L.R.6th 327, §§12, 14 (2006).

According to defendant, "the law is clear that hot pursuit is not itself an exigent circumstance or exception to the warrant requirement, but merely one factor to consider." He cites <u>Lagle</u>, 200 Ill. App. 3d at 955, 558 N.E.2d at 519, in which the Fifth District disagreed with the State's contention "that 'hot pursuit' [was] an exception to the warrant requirement separate and distinct from the exigent[-]circumstances exception." The Fifth District stated:

> "The cases do not discuss a separate hot
> pursuit exception to the warrant requirement,
> but discuss it within the context of
> discussing exigent circumstances. Hot
> pursuit is merely one factor to be considered
> in determining whether exigent circumstances

justified a warrantless home entry.  See

Dorman v. United States (1969), 435 F.2d 385,

391 ('Another doctrine excusing failure to

obtain a warrant in case of entry for arrest

has been cast in terms of "exigent

circumstances," or "necessitous

circumstances."  While some decisions also

refer to condition of "hot pursuit," this

term is not a limitation but rather an

illustration of the kind of exigent

circumstance justifying entry without a

warrant to arrest a suspect')."  Lagle, 200

Ill. App. 3d at 955, 558 N.E.2d at 519.

In its holding in Santana, the Supreme Court did not refer to hot pursuit as only one factor among others.  Although the Court remarked upon the possibility of destruction of evidence, its final, unqualified holding was as follows:  "[A] suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson, by the expedient of escaping to a private place."  Santana, 427 U.S. at 43, 49 L. Ed. 2d at 305, 96 S. Ct. at 2410.  The Court did not add the qualification "provided that other factors" (such as those listed in Foskey) "are satisfied."  Most courts appear to take Santana's holding at face value, treating hot pursuit as an

exception unto itself rather than as just another factor. E.g.,
People v. Tillman, 355 Ill. App. 3d 194, 198, 823 N.E.2d 117,
121-22 (2005), appeal denied, 215 Ill. 2d 616, 833 N.E.2d 8
(2005); People v. Wimbley, 314 Ill. App. 3d 18, 25, 731 N.E.2d
290, 295 (2000) ("Courts have also found exigent circumstances
where police are in 'hot pursuit' of a suspect who flees from a
public place into his residence"); State v. Blake, 468 N.E.2d
548, 553 (Ind. App. 1984) ("immediate and continuous pursuit from
the scene of the crime formed the exigent circumstance"); People
v. Lloyd, 216 Cal. App. 3d 1425, 1429, 265 Cal. Rptr. 422, 425
(1989) ("the officer's 'hot pursuit' into the house to prevent
the suspect from frustrating the arrest which had been set in
motion in a public place constitutes a proper exception to the
warrant requirement").

Hot pursuit, as an exception unto itself, appears to
have deep roots in 17th- and 18th-century English common law.
Payton, 445 U.S. at 598, 63 L. Ed. 2d at 658, 100 S. Ct. at 1386.
Hale stated:  "[I]f the supposed offender fly and take house, and
the door will not be opened upon demand of the constable and
notification of his business, the constable may break the door,
tho[ugh] he have no warrant."  2 M. Hale, Pleas of the Crown 92
(1736), quoted in Payton, 445 U.S. at 595 n.41, 63 L. Ed. 2d at
656 n.41, 100 S. Ct. at 1385 n.41.

One court has explained:

- 42 -

"Hot pursuit situations have a policy basis distinct from other exigent circumstances in that they involve arrests that have already been set in motion. Logic dictates that, regardless of the gravity of the offense, an individual should not be able to avoid an otherwise lawful warrantless arrest merely by outracing the police officers into the individual's dwelling." Erickson v. Commissioner of Public Safety, No. C2-92-507, slip op. at ___ (Minn. App. August 25, 1992).

Under Minnesota law, this unpublished opinion is "not precedential," but parties are permitted to cite it (Minn. Stat. §480A.08(3) (2004)), and we find its logic to be persuasive.

Thus, we respectfully disagree with the Fifth District's discussion of the doctrine of hot pursuit in Lagle. Moreover, we are uncertain that the language the Fifth District quotes from Dorman actually supports the proposition that the Fifth District draws from it: just because one characterizes hot pursuit as an "exigent circumstance," it does not necessarily follow that hot pursuit is "merely one factor" among others.

When defendant repeatedly ignored Dawdy's commands to stop and tried to elude him by going (or, rather, staggering)

into Foiles's house, reasonable suspicion ripened into probable cause, and the fourth amendment did not require Dawdy to simply shrug his shoulders and go obtain a warrant. Apparently, defendant thought the enforcement of traffic laws resembled a children's game of tag, whereby Dawdy was "it" and defendant was "safe" if he reached "home" before Dawdy apprehended him. See United States v. Schmidt, 403 F.3d 1009, 1014 (8th Cir. 2005). As Santana teaches, the fourth amendment does not contemplate this game.

### III. CONCLUSION

Because the State nol-prossed the criminal DUI case, we dismiss this appeal in part insomuch as it pertains to the suppression of evidence and quashing of the arrest. We reverse the trial court's rescission of the summary suspension of defendant's driver's license.

Dismissed in part and reversed in part.

STEIGMANN, P.J., and COOK, J., concur.