Docket No. 104181.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT W. WEAR, Appellant.

*Opinion filed July 24, 2008.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Garman and Karmeier concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion, joined by Justices Freeman and Kilbride.

**OPINION**

The central issue in this case is whether an officer's warrantless arrest of Robert W. Wear inside of a residence was in violation of the fourth amendment such that the statutory summary suspension of his driving privileges should be rescinded (625 ILCS 5/2–118.1(b) (West 2006)). The circuit court of Greene County ultimately found "no reasonable grounds" for the arrest. The appellate court reversed, finding that the officer had probable cause to arrest Wear and the warrant requirement for entry into the residence was excused under

the doctrine of "hot pursuit." 371 Ill. App. 3d 517. This court allowed Wear's petition for leave to appeal (210 Ill. 2d R. 315) and we affirm.

## BACKGROUND

On January 2, 2006, Wear was charged with driving a vehicle under the influence of alcohol (DUI) (625 ILCS 5/11–501(a)(2) (West 2006)) in Greene County case number 06–DT–1 and a failure to signal when required in Greene County case number 06–TR–9. A statutory summary suspension of Wear's driver's license was entered due to his failure to submit to a chemical breath test. The record reveals a traffic ticket alleging that Wear committed the DUI in the city of White Hall on January 2, 2006, at 12:52 a.m. On that date, Officer Christopher Dawdy served upon Wear a form notice of the summary suspension of his commercial driver's license for refusing to submit to a chemical breath test at 2:12 a.m. Because Wear was not a first offender, his commercial driver's license privileges would be suspended for three years. In the blank lines on this notice of suspension form, Officer Dawdy wrote in ink, "Driver was very passive when he exited the vehicle he [*sic*] had a strong odor of alcoholic beverage coming from his breath. He stumble [*sic*] outside the vehicle and said he did not want to do field sobrity [*sic*] because he could not pass[.]"

On January 20, 2006, Wear filed a petition to rescind the summary suspension. On January 24, 2006, Wear filed a motion to suppress evidence and quash his arrest in the DUI case. On February 10 and February 17, 2006, the trial court held an evidentiary hearing on each motion simultaneously. The parties were at odds over the facts.

Wear called several witnesses: Officer Dawdy, three persons who had been with him at a tavern prior to the arrest, and his girlfriend, Patricia Foiles, in whose house the arrest occurred. Wear also testified.

Officer Dawdy testified that at approximately 12:52 a.m. on January 2, 2006, he was on patrol at the western edge of White Hall traveling westbound on West Lincoln Street, although he stated on cross-examination that he was traveling eastbound. According to photographic exhibits, Lincoln Street is a roadway without lane markings and a small discernable shoulder. It is bisected into West and East Lincoln by Main Street. Officer Dawdy observed a white Cadillac

"traveling pretty fast" driving on "West Lincoln going east." He testified that the speed limit at that point was 30 miles per hour, and he "would have said they would have been going at least 40" but he did not have a radar gun. Officer Dawdy testified the Cadillac "swerved over towards me," whereupon Officer Dawdy performed an evasive maneuver and "got off the side and went to the nearest road to turn around."

Officer Dawdy testified that he drove on to Bruce Street and reversed direction, now traveling eastbound. At this point, he observed the Cadillac "swaying back and forth." He traveled for six or seven blocks before he was within five car lengths of the Cadillac. At this moment, the Cadillac was crossing Main Street (where West Lincoln turned into East Lincoln), which is approximately a half mile east of Bruce Street. By the time the Cadillac crossed over the railroad tracks, approximately another quarter mile beyond Main Street, Officer Dawdy testified that he was "right behind it," less than a car's length away. According to the transcript, he stated on direct that the car was still swerving. On cross-examination, when asked if he observed anything alarming, he stated, "not on E[ast] Lincoln." Officer Dawdy testified that the Cadillac did not commit any traffic violations or hit any parked cars while on Lincoln Street.

The Cadillac thereafter reached the T-intersection of Bates Street and Lincoln Street, which is two blocks past the railroad tracks, on the eastern edge of White Hall, approximately one mile after the initial encounter. Bates is a side street without lane markings. Officer Dawdy observed the Cadillac make a "wide" right onto Bates Street without a turn signal. He admitted that Bates Street is a narrow street and that there were no other cars present at that time of night. He also testified to photographic exhibits that showed vehicles driving in the middle of, or even on the wrong side of, Bates Street.

Officer Dawdy testified that he initiated the traffic stop as soon as the Cadillac turned onto Bates. Officer Dawdy engaged his rotator lights and his spotlights. The Cadillac, although driving at a normal rate of speed, did not stop for five or six blocks, approximately a half mile from Lincoln. The Cadillac was swerving and listing to the left while Dawdy was following it in a normal fashion. Dawdy admitted that there were manholes and dips in the road, and that "[p]eople would probably avoid hittin' 'em." Officer Dawdy testified that he

-3-

observed that the Cadillac "rolled through one stop sign," at the point that Bates Street is renamed Israel Street. The Cadillac came to a complete stop at the next stop sign at East Carlinville Street. The car turned left. Officer Dawdy does not remember if the Cadillac used its turn signal. The Cadillac went a short distance and pulled into a residence on the south side of East Carlinville Street, which was a right-hand turn for the Cadillac. The Cadillac parked straight in the driveway and did not strike the house, the mailbox, or the van which was also in the driveway.

Officer Dawdy pulled into the driveway behind the car with all of his police vehicle's lights illuminated. The driver, whom Officer Dawdy later identified as Wear, exited the Cadillac. Officer Dawdy testified, "I exited my vehicle and told the driver to get back in his vehicle; and he just kept walking." He added, "He was crossing his feet and kind of swayin' and stumblin', but I *** kept repeating myself to tell him to get back in the vehicle and he just ignored me like I wasn't even there." Wear did not fall or have to catch himself, nor was he running. Wear "went up the sidewalk to the door of the house," which is approximately 15 feet from where Wear would have exited his vehicle. A photographic exhibit depicts the scene as a short gravel driveway, a cracked sidewalk, a step up onto the porch, a porch filled with numerous items of disorganized furniture, and a door.

The events at the doorway were minutely examined by the parties before the trial court. Officer Dawdy testified that a female, identified as Wear's girlfriend, Patricia Foiles, opened the door. Wear "was in the doorway at that point when she opened the door and wanted to know what was going on." Wear did not speak to Officer Dawdy "when he was walking up the sidewalk. I didn't speak with him, or he didn't speak to me until he got inside the doorway and he told me that he made it home." Foiles asked what was happening and Officer Dawdy "told her that I had been following him down Bates Street with my lights on, and he wouldn't pull over." It is unclear from the transcript whether Wear went into the house before or after Dawdy spoke with Foiles. He did not tell her that he wanted to speak with Wear but instead, Officer Dawdy testified, "the whole time I was asking him for his identification 'cause I didn't know exactly who it was." When asked the distance between himself and Wear at that

point, Officer Dawdy answered, "[p]robably less than one foot because I was right there. I didn't know exactly why he wasn't going along with what I was telling him. I was telling him to stop, get back. So, I was right there, so I could manage him if something had happened there *** [f]or my safety." Officer Dawdy related that he said something like " 'stop, get back in the car,' *** close to five times. I just kept repeating it, telling him to get back there" and Wear "never even acknowledged that I was there when he was walking." At the doorway, "He told me that he made it home and that's the first time he stated that–he did state that several times[,] too, that he had made it home." At this point, Officer Dawdy testified, he could smell alcohol on Wear's breath. On redirect, Officer Dawdy admitted that he had not written in his report that Wear was staggering or swaying.

Officer Dawdy followed Wear inside, continuing to ask Wear for his identification. Officer Dawdy ordered Wear to exit the house so he could perform a field sobriety test on him. At this time, Officer Dawdy could smell a strong alcoholic odor about Wear. Officer Dawdy also asked Wear where he was coming from and whether he had been drinking; Wear responded that he had been drinking at the Hillview Tavern. Wear refused to give identification or blow into a portable breath-testing device, although Dawdy asked twice. Wear told him that he did not want to do field sobriety tests because he "did not feel anybody could pass it." Officer Dawdy then continued to ask for his identification and, "He still wouldn't give it to me, so I told him I was placing him under arrest." Officer Dawdy attempted to grab Wear's arm, but Wear pulled it away. Officer Dawdy then handcuffed Wear and led him outside and placed him in the squad car. Wear refused to blow into the portable breath-testing device.

Officer Dawdy testified that he had been inside several minutes before he formed the intent to arrest Wear. However, as he stated, "when I went inside, I had a pretty good suspicion that he was drunk."

Wear testified that he is a 57-year-old Hillview resident. He is a farmer who also possesses a commercial driver's license for off-season work. He testified that on January 1, 2006, at approximately 8:30 p.m. he visited the Hillview tavern to play pool. Wear testified that he drank three 12-ounce cans of Keystone Light, a beer he normally consumed. He testified that he remained sober, and shot pool according to his normal skill. He left the tavern at 11:30 or 11:45 p.m.

Several witnesses corroborated Wear's testimony. The bartender, Bonnie Hardwick, corroborated Wear's testimony concerning Wear's alcohol intake as to that evening and his normal habits. Roger Cox and James Buchanan, patrons at the tavern that night, stated that they saw Wear drink one or two beers before and during their matches at the pool table, but could not testify to the exact number of beverages that he consumed during the entire evening. These witnesses did not feel that Wear was intoxicated that night when he left. Their testimony consisted of several signs of sobriety, notably as to his speech (that he was not unusually loquacious or slurring his words) and his actions (he was playing pool skillfully, was not stumbling, swaying, or staggering, and did not otherwise appear intoxicated). Hardwick stated that she has seen Wear intoxicated and he has a tendency to walk "with a different gait than normal."

Wear testified that after he left the bar, he went to his house in Hillview. He checked his e-mail and did not imbibe any alcoholic beverages. He called his girlfriend, Patricia Foiles, at 12:38 a.m. on January 2, 2006, to tell her that he was going to go to her house to sleep over, as he did often since they had been dating. He left for Foiles' house, which is approximately a 12- or 15-minute drive.

Wear testified that he drove approximately nine miles east to Foiles' house and had no trouble driving on Lincoln Street. He made two stops on Lincoln, at Carr Street and at Main Street. Wear testified that he did not see any other vehicles when he was on Lincoln. Rather, he was driving "normal, right down the middle of the road going in manholes and the bumps–it's not a level road." Wear testified that he was not weaving and swerving, and was also going near the speed limit because his Cadillac was "an old car" with a faulty "air suspension" which he tended to "baby."

Wear testified that he used his turn signal to turn right onto Bates. He made a rolling stop at the first stop sign and then a full stop at the second stop sign at East Carlinville. He noticed lights behind him when he stopped at Carlinville. He stated, "I mean, my first reflex was that it was an ordinary driver with his lights on bright, right on top of my bumper. *** Then immediately thereafter *** I knew it was a police car and I thought I was in his way and I made my turn." He later added, "I was in the process of turning, so I went ahead and made the turn to get out of his way." He thought the police car was

pursuing a "life and death situation." He turned left on Carlinville and went a "short block" and parked in Foiles' driveway. He had no trouble parking. He had no trouble going into the house and had no trouble getting in. He did not notice any other cars at that time. He testified that he did not stumble, stagger, or sway. Foiles testified consistently with Wear, and also testified that Wear did not appear to be intoxicated. Foiles testified that she looked out the window after Wear entered and did not see any other vehicles.

Shortly thereafter, according to both Foiles and Wear, Officer Dawdy entered the house without verbally announcing himself, knocking, or asking for their consent to enter. Officer Dawdy asked Foiles if she wanted him to mace Wear. Officer Dawdy insisted that Wear exit the house and there was a short conversation about Wear's drinking that evening. Wear was not asked to do field sobriety tests while inside the house. Officer Dawdy arrested Wear and placed him in handcuffs and took him outside. Wear confirmed that he refused a chemical breath test after he was arrested.

At the conclusion of the hearing, Wear's counsel argued that the officer was "embellishing" and "lying." He further argued that the officer did not notice any impaired speech or bloodshot eyes, or include a number of relevant events in his report. He also emphasized that the other witnesses had testified that Wear appeared to be sober. He pointed to the citation indicating under oath that the entire incident occurred at 12:52 a.m., in contrast to Officer Dawdy's testimony that it occurred over 5 or 10 minutes. Furthermore, according to defense counsel, even if the court credited Officer Dawdy's testimony, there was no probable cause or exigent circumstances to justify the warrantless entry into Foiles' house without consent.

The State's Attorney argued that the police officer was credible. He added that it was up to the court to determine the credibility of the witnesses at the bar, but suggested that Wear drank at home after the bar and before he left for Foiles' house. The State's Attorney related that Officer Dawdy had testified that he had formed the intent to arrest Wear while he was at the door of the house, prior to entry. The State's Attorney argued that the totality of the circumstances supported a finding of probable cause: the initial swerve, the failure to use a turn signal, the swerving on Bates, the failure to obey the lights, the staggering, swaying, and stumbling, the odor of alcohol on his

breath, and the phrase "I made it home." He also asserted that there was no violation of the fourth amendment because Officer Dawdy was engaged in a "hot pursuit," although he added, "We can debate about how hot it was." He added, "He is in pursuit, there is a destruction of evidence, and just for the common sense reason that we send the message to DUI defendants if you get home fast enough, get inside your house, there is really nothing the police can do short of getting a warrant or getting permission from the homeowner, which may be hard to do."

The trial court entered a written order on February 24, 2006. The trial court noted the two sides' discrepancies in the testimony as to the initial swerve, the turn onto Bates, the swerving on Bates Street, the first stop sign on Bates Street, the second stop sign on Bates/Israel Street, and the arrival at Foiles' residence. The court stated, "Not all of the evidence is officer versus defendant. *** Particularly noteworthy is the defendant testified that the bright lights were 'on my bumper' just as the defendant turned." The trial court stated, "Here the court finds that after considering all of the evidence, the controverted facts must be resolved in favor of the State." The court then noted the proposition that a proper warrantless arrest which begins in a public place cannot be thwarted by the act of the arrestee retreating into his home to evade arrest, citing *People v. Lagle*, 200 Ill. App. 3d 948 (1990), and *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976). The court stated, "The court finds that the arrest commenced in a public place and defendant could not thwart his lawful arrest by retreating into his girlfriend's residence." The court therefore denied the petition to rescind and the motion to suppress evidence and quash arrest for driving under the influence. The order made no explicit finding of probable cause.

Wear filed a motion to reconsider. He argued that the trial court failed to make a specific ruling as to whether there was probable cause and, further, that the circumstances did not show probable cause. Wear also challenged the court's legal ruling, stating that *United States v. Santana* was inapplicable because the transcript showed Officer Dawdy did not begin his arrest until inside the house. He also argued that the primary reason the officer entered was because of Wear's refusal to identify himself. The State argued that according to the totality of the circumstances, there was probable cause to arrest.

At oral argument on the motion to reconsider, the trial court stated as to the State's version of events, "Of course, according to [defense counsel] Mr. Turpin, or Mr. Turpin's client, none of that happened."

On April 5, 2006, the following docket entry appears in the record, "After considering the arguments of counsel at the hearing on the Motion to Reconsider, the court grants the Motion to Reconsider Ruling. Petition to Rescind Statutory Summary Suspension is granted. The Motion to Suppress Evidence is granted and the Motion to Quash Arrest is granted. Clerk directed to provide copy of docket entry to State's Attorney and to Attorney Turpin." The circuit court clerk completed and signed a form notice to the Secretary of State, as required by section 2–118.1(b) of the Illinois Vehicle Code (625 ILCS 5/2–118.1(b) (West 2006)). The form states that "[u]pon the conclusion of the judicial hearing, the Circuit Court found in favor of" with a box marked with an "X" next to "defendant" followed by "SUMMARY SUSPENSION OF DRIVING PRIVILEGES RESCINDED due to:" a box with an "X" with a circle around it followed by "No Reasonable Grounds."

On April 10, 2006, a hearing was conducted on the turn-signal case. After the court stated "[t]he court sees no reason to suppress any evidence on the turn signal charge," Wear pleaded guilty. There is a docket entry that states, "Arrest quashed in 06–DT–1. Cause stricken. *** Notice given to Defendant, State's Attorney and Attorney Turpin in open court." Also on that date, on the reverse side of the traffic ticket for the DUI case, there is a handwritten notation which states, "dismissed nolle prossed." On the reverse side of the carbon copy of that same ticket, under the heading "Court Action and Other Orders" and the subheading "findings," the circuit court clerk handwrote an "X" in the box corresponding to "[n]olle prosequi"; signed the line reserved for his signature; and above the words "Date Order Entered" wrote "April 10, 2006."

On April 27, 2006, the State appealed from the order of April 5, 2006, in which the trial court granted Wear's motion to reconsider its rulings on the petition to rescind the summary suspension and the motion to suppress evidence and quash the arrest. On July 27, 2006, the State filed a certificate of impairment.

Wear first argued that the appeal of the motion to suppress evidence and quash arrest should be dismissed because the State nol-

prossed the DUI case. 371 Ill. App. 3d at 523. The appellate court quoted an affidavit from the circuit court clerk noting that, in regard to the *nolle prosequi* order, at no time did he consult with the State's Attorney or the judge in making this form; he only did it for record-keeping purposes. 371 Ill. App. 3d at 523-24. However, finding that this affidavit was inadmissible to impeach the record, and that the State had not moved to vacate that order, the appellate court granted Wear's motion to dismiss the appeal of the order granting the motion to quash the arrest and suppress evidence. 371 Ill. App. 3d at 526. The appellate court refused Wear's motion to dismiss the summary suspension case because it was a separate civil proceeding, and the agreement to dismiss the DUI charge would not reasonably imply a rescission of the statutory suspension. 371 Ill. App. 3d at 527. Further, the record contained no objective evidence that the State agreed to the rescission of the summary suspension. 371 Ill. App. 3d at 527. The appellate court next found that the exclusionary rule was applicable to this proceeding, and neither party asserted otherwise. 371 Ill. App. 3d at 527-28.

The appellate court also rejected Wear's argument that, in viewing the April 5 order, the court must presume that the trial court found all issues and controverted facts in favor of the prevailing party. 371 Ill. App. 3d at 531. Instead, the appellate court held that the trial court retained its factual findings from the February 24 order because the motion to reconsider was primarily directed to the trial court's ruling pursuant to *Santana*. 371 Ill. App. 3d at 531.

The court next discussed *Santana*. The court stated, "Before defendant retreated into the house, Dawdy set in motion an investigatory stop, not an arrest. Otherwise, this case resembles *Santana*" because there was probable cause for an arrest for DUI. 371 Ill. App. 3d at 532-33. The appellate court found that, under the facts, Dawdy was in "hot pursuit" of Wear, an exception to the warrant requirement of the fourth amendment. 371 Ill. App. 3d at 538. "When defendant repeatedly ignored Dawdy's commands to stop and tried to elude him by going (or, rather, staggering) into Foiles's house, reasonable suspicion ripened into probable cause, and the fourth amendment did not require Dawdy to simply shrug his shoulders and go obtain a warrant." 371 Ill. App. 3d at 538.

We allowed Wear's petition for leave to appeal. 210 Ill. 2d R. 315(a).

## ANALYSIS

Section 11–501.1(a) of the Illinois Vehicle Code (625 ILCS 5/11–501.1(a) (West 2006)) provides, in pertinent part, that "[a]ny person who drives or is in actual physical control of a motor vehicle upon the public highways of this State shall be deemed to have given consent *** to a chemical test or tests of blood, breath, or urine for the purpose of determining the content of alcohol *** in the person's blood if arrested *** for [DUI]." If a motorist submits to testing that reveals a blood-alcohol level in excess of the legal limit, or if he or she refuses to submit to testing, his or her driving privileges will be summarily suspended by the Secretary of State upon the submission of a sworn report of the arresting officer. 625 ILCS 5/11–501.1(d), (e) (West 2006). A motorist whose driving privileges have been summarily suspended may request a judicial hearing to seek rescission of the suspension. 625 ILCS 5/2–118.1 (West 2006).

A hearing on a petition to rescind a summary suspension is a civil proceeding in which the driver bears the burden of proof. *People v. Smith*, 172 Ill. 2d 289, 294-95 (1996). If the driver establishes a *prima facie* case for rescission, the burden shifts to the State to come forward with evidence justifying the suspension. *Smith*, 172 Ill. 2d at 295. There are four issues that may be raised: (1) whether the person was placed under arrest for an offense under section 11–501 (625 ILCS 5/11–501 (West 2006)); (2) whether the officer had reasonable grounds to believe that the person was driving or in actual physical control of a motor vehicle while under the influence of alcohol, another drug, or both; (3) whether the person received the statutory motorist's warning and refused to complete the test or tests; and (4) whether the test or tests disclosed an alcohol concentration of 0.08 or more. 625 ILCS 5/2–118.1(b)(1) through (b)(4) (West 2006). Here, the court entered an order pursuant to subsection (b)(2) of the statute, rescinding the summary suspension due to "no reasonable grounds."

In determining whether there has been "reasonable grounds" under subsection (b)(2) of the statute, this court has utilized the probable cause analysis deriving from the fourth amendment. *Smith*, 172 Ill. 2d

at 297, citing *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968). Similarly, courts often use the phrase "reasonable grounds" coterminously with "probable cause" in summary suspension proceedings. *Smith*, 172 Ill. 2d at 297 (referring to "probable cause" in a summary suspension proceeding); *People v. Luedemann*, 222 Ill. 2d 530, 532 (2006) (noting that the basis for both a defendant's motion to suppress and a petition to rescind was the lack of "probable cause"); *People v. Rush*, 319 Ill. App. 3d 34 (2001); *People v. Fortney*, 297 Ill. App. 3d 79, 87 (1998). This is because the issues raised in a petition to rescind and a motion to suppress are overlapping. *Rush*, 319 Ill. App. 3d at 38. Indeed, in *People v. Luedemann*, we reviewed the appeal of a petition to rescind and a motion to suppress without making a distinction between the analysis applied to either motion, although an argument was not made to this court that such a distinction should be made. *Luedemann*, 222 Ill. 2d 530.[1] Hence, in this review of an appeal of a petition to rescind, we use the standard of review applicable to the review of suppression hearings. *Luedemann*, 222 Ill. 2d at 542.

We apply the two-part standard of review that the United States Supreme Court adopted in *Ornelas v. United States*. *Luedemann*, 222 Ill. 2d at 542, citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). A reviewing court will uphold findings of historical fact made by the circuit court unless

---

[1]This court has never specifically ruled whether the exclusionary rule should apply to implied-consent proceedings, and does not do so here. The appellate court has ruled on this question. See, *e.g.*, *People v. Krueger*, 208 Ill. App. 3d 897, 903-04 (1991) (holding that the exclusionary rule applies to summary suspension proceedings). While the State argues in its response brief that the exclusionary rule does not apply to summary suspension proceedings, the State did not raise this argument before the trial court or the appellate court. 371 Ill. App. 3d at 528. Therefore, because this argument was not raised earlier, it is forfeited. *People v. Whitfield*, No. 102985 (December 13, 2007). We do, however, acknowledge that the use of the phrase "exclusionary rule" is a misnomer in this context. A prevailing petitioner would not gain the exclusion of anything from a rescission hearing. Rather, if the court finds "no reasonable grounds" for an arrest, then the suspension is simply rescinded.

such findings demonstrate clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder. *Leudemann*, 222 Ill. 2d at 542, citing *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663. "In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *Luedemann*, 222 Ill. 2d at 542, citing *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief may be granted. *Leudemann*, 222 Ill. 2d at 542, citing *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). "Accordingly, we review *de novo* the trial court's ultimate legal ruling" as to whether the petition to rescind should be granted. *Leudemann*, 222 Ill. 2d at 542-43, citing *Ornelas*, 517 U.S. at 699, 134 L. Ed. at 920, 116 S. Ct. at 1663, *Pitman*, 211 Ill. 2d at 512; *Sorenson*, 196 Ill. 2d at 431. We therefore turn to the relevant fourth amendment principles applicable to Officer Dawdy's warrantless arrest of Wear inside Foiles' home.

The physical entry of the home is the chief evil against which the wording of the fourth amendment is directed. *Welsh v. Wisconsin*, 466 U.S. 740, 748, 80 L. Ed. 2d 732, 742, 104 S. Ct. 2091, 2097 (1984); *Payton v. New York*, 445 U.S. 573, 585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379 (1980). The fourth amendment guarantees: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, §6. It is a basic principle of the fourth amendment that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton*, 445 U.S. at 586-87, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380. This is because, " '[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.' " *Payton*, 445 U.S. at 588-89, 63 L. Ed. 2d at 652, 100 S. Ct. at 1381, quoting *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978); see also *People v. Foskey*, 136 Ill. 2d 66, 75 (1990)

-13-

(requiring probable cause and exigent circumstances before an officer may make a warrantless arrest inside a home).

The constitutionally prescribed sanctity of the home, however, is not limitless. As the United States Supreme Court in *Brigham City v. Stuart*, 547 U.S. 398, 164 L. Ed. 2d 650, 126 S. Ct. 1943 (2006), recently stated, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403, 164 L. Ed. 2d at 657, 126 S. Ct. at 1947, citing *Flippo v. West Virginia*, 528 U.S. 11, 13, 145 L. Ed. 2d 16, 19, 120 S. Ct. 7, 8 (1999) (*per curiam*); *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967). "[L]aw enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause [citation], to prevent the imminent destruction of evidence [citation], or to engage in ' "hot pursuit" ' of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42, 43 (1976)." *Brigham City*, 547 U.S. at 403, 164 L. Ed. 2d at 657, 126 S. Ct. at 1947. Relevant to the matter at hand is only one of those enumerated "exceptions," namely, "hot pursuit" as set forth by *United States v. Santana*, 427 U.S. at 42-43, 49 L. Ed. 2d at 305, 427 S. Ct. at 2409-10.

Accordingly, we must first determine if Officer Dawdy had probable cause to arrest Wear outside of the residence. If so, we consider if Officer Dawdy's warrantless and nonconsensual entry into Foiles' home was excused under the doctrine of "hot pursuit."


Probable Cause

Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *People v. Love*, 199 Ill. 2d 269, 279 (2002). That is, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *Love*, 199 Ill. 2d at 279, citing *People v. Tisler*, 103 Ill. 2d 226, 237-38 (1984) (following *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)). " 'In dealing with probable cause, *** we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Love*, 199

Ill. 2d at 279, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949); accord *People v. Wright*, 111 Ill. 2d 128, 146 (1985) (probable cause is a practical concept). " 'The standard for determining whether probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt. [Citations].' " *People v. Garvin*, 219 Ill. 2d 104, 115 (2006), quoting *People v. Lee*, 214 Ill. 2d 476, 485 (2005). Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false. *People v. Jones*, 215 Ill. 2d 261, 277 (2005), quoting *Texas v. Brown*, 460 U.S. 730, 742, 75 L. Ed. 2d 502, 514, 103 S. Ct. 1535, 1543 (1983) (plurality op.).

Here, the trial court credited the officer's version of events. Wear does not renew his argument before the appellate court that the trial court's April 5 order superseded the February 26 factual findings. Rather, he obliquely questions the credibility of the officer in his opening and reply briefs without arguing that the trial court's findings were against the manifest weight of the evidence. Courts of review, however, will uphold findings of historical fact. *Luedemann*, 222 Ill. 2d at 542.

The following factors drawn from Dawdy's testimony are relevant to determining whether Dawdy had probable cause from an objective perspective before he entered Foiles' home: Dawdy testified the Cadillac was going at a "high rate of speed" perhaps 40 miles per hour in a 30-mile-per-hour zone, but he did not have a radar gun and was going in the opposite direction; the Cadillac swerved at Dawdy, requiring Dawdy to take evasive action; after Dawdy turned around, Dawdy did not observe the Cadillac swerving by the time he caught up to him "less than a car length" on East Lincoln, although he testified that he saw the car swaying at some point; the Cadillac turned onto Bates, making a "wide" turn onto a narrow street; the Cadillac did not use a turn signal; Dawdy turned on his rotator lights and his takedown lights, but not his siren; Dawdy followed the Cadillac that was weaving on Bates/Israel, a street with manholes and dips, that Dawdy said drivers would probably avoid; the Cadillac rolled through a stop sign and made a full stop at another, all while driving at a normal speed; Wear exited the vehicle and stumbled, swayed, and staggered the 15 feet from the car door to the residence, a path that

pictures show has cracked concrete, a step, and disorganized furniture on the porch; Wear did not respond to Dawdy's five or six commands to get back into the vehicle; Foiles opened the door; Wear stopped at the threshold, apparently turned around, and stated several times while he was at the door, "I made it home"; as Wear was saying this, Dawdy was less than a foot away; Dawdy described Wear's breath as having an odor of alcohol.

Based on the above, we conclude that there was probable cause to arrest Wear, as a reasonably cautious person would have thought a crime had taken place. At the very least, the officer had probable cause at the threshold of Foiles' house. There, Wear told Officer Dawdy "I made it home" several times. His breath also had an odor of alcoholic beverage. The officer also observed instances of swerving, rolling through a stop sign, as well as stumbling and staggering while ignoring the officer's repeated orders to stop. This is in addition to the failure to use a turn signal, a violation of the Vehicle Code (625 ILCS 5/11–804(b) (West 2006)), and also the failure to come to a complete stop, a separate traffic violation (625 ILCS 5/11–904(b) (West 2006)). These circumstances, in totality, indicate that Officer Dawdy, viewed objectively, had probable cause to arrest Wear for DUI.

Wear further maintains that because Officer Dawdy's own testimony was that he did not have probable cause outside of Foiles' house, then this court cannot find he had probable cause on review. We note that the United States Supreme Court has recently rejected an argument similar to Wear's, regarding a police officer's subjective state of mind. As the Court stated in *Brigham City*, 547 U.S. at 404, 164 L. Ed. 2d at 658, 126 S. Ct. at 1948:

> "Our cases have repeatedly rejected this approach. An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' [Citation.] The officer's subjective motivation is irrelevant." (Emphasis omitted.)

Accordingly, it is irrelevant that Officer Dawdy did not form the intent to arrest Wear until he was inside, because, based on objective circumstances, he retained the ability to arrest him when he was outside.

-16-

Wear also argues that the appellate court extended the holding of *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976), to permit a warrantless, nonconsensual entry into a dwelling to conduct an investigatory *Terry* stop when the officer is in "hot pursuit." The State, however, disagrees with this reading of the appellate court opinion and does not contest this specific issue.[2] To the extent that the appellate court opinion may be so read, however, we reiterate that the language of the fourth amendment itself explicitly prohibits entry into the home absent probable cause. U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, §6. Hence, were objective indicia of probable cause absent in this case, Officer Dawdy's entry into the residence to merely conduct an investigatory *Terry* stop would have violated the fourth amendment. See *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000); *In re D.W.*, 341 Ill. App. 3d 517 (2003). Nevertheless, Wear's reading of the appellate opinion is irrelevant as we have noted probable cause existed in the present matter. We therefore turn to whether Officer Dawdy's entrance of the residence through the open door following Wear was permissible "hot pursuit" under *Santana*.

Hot Pursuit

Generally, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment, even

---

[2]The State asserts in its brief: "Wear's concern that the decision below will permit police to enter a residence with mere reasonable suspicion, rather than probable cause, is baseless. Wear's repeated assertion that the appellate court's ruling allows police to enter a residence under the *Santana* 'hot pursuit' doctrine based solely on reasonable suspicion is incorrect: the appellate court clearly held that Dawdy's entry *was* predicated on probable cause *** it said nothing about what Dawdy could have done based on mere reasonable suspicion. The appellate court's holding–that whether an officer 'intends' to effect a stop or an arrest is irrelevant under *Santana*'s hot pursuit rule–simply does not address the hypothetical situation Wear poses."

with probable cause.[3] *Payton*, 445 U.S. at 586-87, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380. Notwithstanding the warrant requirement, a suspect may not defeat an arrest that was set in motion in a public place by escaping to a private place. *United States v. Santana*, 427 U.S. 38, 43, 49 L. Ed. 2d 300, 306, 96 S. Ct. 2406, 2410 (1976). In *Santana*, the police had probable cause to arrest an individual and drove to her house to do so. Upon arriving there, the police observed the person standing directly in the doorway of the house. *Santana*, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408. The police identified themselves and, as they approached, Santana retreated into her house. *Santana*, 427 U.S. at 40, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408. The officers followed her in, catching her in the vestibule. *Santana*, 427 U.S. at 40-41, 49 L. Ed. 2d at 304, 96 S. Ct. at 2408-09.

The Court determined that Santana was in a public place as she stood in the doorway and was subject to a warrantless arrest at that point. *Santana*, 42 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. More importantly, the Court concluded that the police were not required to refrain from entering the home and arresting her without a warrant. The Court pointed out that "hot pursuit," which justified the warrantless entry in that case, meant "some sort of a chase" but did not require an extended pursuit through the public streets. *Santana*, 42 U.S. at 43, 49 L. Ed. 2d at 305, 96 S. Ct. at 2410.

Here, we see little relevant difference between this case and *Santana*. In both cases, the officers had probable cause to arrest when they were standing in the doorway, which is considered a public place. The *Santana* Court held that police were not required to refrain from entering the home and arresting her without a warrant. Similarly, Officer Dawdy was not required to refrain from entering Foiles' home and arresting Wear without a warrant because he had probable cause to arrest the Wear at the threshold and Wear continued inside.

---

[3]Wear's standing is not at issue, as the parties stipulate as to standing under *Minnesota v. Olson*, 495 U.S. 91, 96-97, 109 L. Ed. 2d 85, 93, 110 S. Ct. 1684, 1688 (1990), which stated, "Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."

Moreover, additional facts are present in this case that are not present in *Santana*. Unlike *Santana*, Dawdy was already in pursuit of defendant after he turned around at Bruce Street. As Wear continued toward Foiles' house, there were more and more indications that Wear had committed a DUI. Officer Dawdy observed a swerve and a traffic violation, then turned on his rotator and takedown lights. These were apparently ignored or unobserved by Wear as he then rolled through a stop sign, and staggered to a door opened by Foiles. He stated, repeatedly, "I made it home" while the door was open and Dawdy stood less than a foot away. At this point, Dawdy testified, he smelled the odor of alcohol emanating from his breath. Although this was not a high-speed chase, under Dawdy's testimony, he told Wear to stop and return to his vehicle five or six times even after he had been following Wear with his lights illuminated for five or six blocks.

We next reject Wear's contention that our decision is controlled by the United States Supreme Court's decision in *Welsh v. Wisconsin* 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984). In *Welsh*, a driver lost control of his car and came to a stop in a field. A witness saw the driver walk away and told the police that the driver was either very inebriated or very sick. The police went to the driver's house, which was a short distance away. The police entered the home without a warrant and arrested the driver who was in his bed naked by that time. *Welsh*, 466 U.S. at 742-44, 80 L. Ed. 2d at 738-39, 104 S. Ct. at 2093-94. In *Welsh*, the Supreme Court first reasoned that the warrantless arrest violated the fourth amendment because there was no immediate or continuous pursuit from the scene of the crime. *Welsh*, 466 U.S. at 753, 80 L. Ed. 2d at 745, 104 S. Ct. at 2099. In contrast, in the instant matter there was an immediate and continuous pursuit at some point after Dawdy illuminated his police vehicle's lights on Bates and Lincoln, and one that continued up to and through the threshold of Foiles' house.

The *Welsh* court also found the warrantless arrest violated the fourth amendment because, in Wisconsin, driving while intoxicated was a nonjailable civil offense. *Welsh*, 466 U.S. at 754, 80 L. Ed. 2d at 745-46, 104 S. Ct. at 2100. As the *Welsh* Court noted, "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Welsh*, 466 U.S. at 753, 80 L. Ed. 2d at 745,

104 S. Ct. at 2099. The *Welsh* Court's opinion was premised on the gravity a state assigns to the offense as the "the best indication of the State's interest in precipitating an arrest." *Welsh*, 466 U.S. at 754, 80 L. Ed. 2d at 746, 104 S. Ct. at 2100, see also *Welsh*, 466 U.S. at 755, 80 L. Ed. 2d at 747, 104 S. Ct. at 2100 (Blackmun, J., concurring) (noting that the outcome of the case depended in large part on Wisconsin's fine-only penalty). Moreover, the *Welsh* Court explicitly stated that "[b]ecause we conclude that, in the circumstances presented by this case, there were no exigent circumstances sufficient to justify a warrantless home entry, we have no occasion to consider whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses." *Welsh*, 466 U.S. at 749 n.11, 80 L. Ed. 2d at 743 n.11, 104 S. Ct. at 2097 n.11.

In contrast, in Illinois, a first DUI is a Class A misdemeanor (625 ILCS 5/11–501(b–2) (West 2006) punishable by up to 364 days in jail. 730 ILCS 5/5–8–3 (West 2006). It is thus apparent that the State of Illinois' interest is significantly different from that of Wisconsin in *Welsh* with regard to the offense of driving while under the influence of alcohol. See *Welsh*, 466 U.S. at 754 n.14, 80 L. Ed. 2d at 746 n.14, 104 S. Ct. at 2100 n.14 (stating "the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense"). We, therefore, do not accept *Welsh* as controlling our decision that Officer Dawdy properly arrested Wear.

Thus, we conclude that Officer Dawdy had probable cause to arrest Wear at the doorway. His warrantless, nonconsensual entry into Foiles' residence was excused under the doctrine of hot pursuit. Therefore, the appellate court properly reversed the trial court's rescission of Wear's summary suspension.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE BURKE, specially concurring:

-20-

I agree with the majority that, based on defendant's driving, Officer Dawdy had reasonable suspicion that defendant was driving while under the influence of alcohol when the officer approached the Foiles residence. Further, I agree that Officer Dawdy's reasonable suspicion ripened into probable cause to arrest for DUI prior to the time that Dawdy crossed the threshold into the Foiles residence. I also agree that under the circumstances of this case, Officer Dawdy entered the residence in "hot pursuit" of the defendant. However, I do not believe that a police officer's warrantless entry into a dwelling may be justified on the basis of "hot pursuit" without regard to the seriousness of the crime for which the person is being pursued. Moreover, even when exigent circumstances, such as "hot pursuit," exist to provide a basis for dispensing with the warrant requirement, the reasonableness of the officer's nonconsensual entry into a private residence, for fourth amendment purposes, depends on the totality of the circumstances. Thus, while I agree with the ultimate result reached by the majority, and therefore concur in its judgment, I disagree with the court's analysis and write separately.

## ANALYSIS

The case at bar provides this court its first opportunity to consider whether "hot pursuit" is an exigency which justifies a warrantless, nonconsensual entry into a home to effectuate an arrest for a nonfelony offense. The majority fails to acknowledge this fact and simply finds that "hot pursuit" justified the warrantless arrest in the case at bar. The majority relies almost exclusively on the Supreme Court decision in *United States v. Santana*, 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976), stating, "we see little relevant difference between this case and *Santana*." Slip op. at 17. *Santana*, however, involved hot pursuit of a fleeing *felon*. Moreover, *Santana* did not rely solely on "hot pursuit" to justify the warrantless entry into the home in that case but, rather, looked to the totality of the circumstances to find the warrantless arrest reasonable under the fourth amendment.

In *Santana*, an undercover narcotics officer for the City of Philadelphia gave marked bills to a contact, Patricia McCafferty, and drove her to the home of "Ma Santana," where she purchased heroin with the marked bills. Shortly after McCafferty returned to the undercover officer's car and turned over the heroin, the officer

revealed his identity and arrested McCafferty. Immediately thereafter other officers, having probable cause to arrest Santana on felony drug charges, went to her home. As they approached the residence, the officers saw Santana standing in the doorway of the house, holding a brown paper bag. The officers exited the police car and ran up to the home, shouting "Police." Santana took a few steps backward into the vestibule of the house and the officers followed her through the open door and arrested her.

When the Supreme Court was asked to consider whether Santana's warrantless arrest had been lawful, seven justices concluded that it was. Justice Rehnquist, writing for the majority, reached this conclusion relying on the fact that, in *United States v. Watson*, 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976), the Court had held that "the warrrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment." *Santana*, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. Applying *Watson* to the situation before the Court, Rehnquist held that, "when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which [was] approved in *Watson*." *Santana*, 427 U.S. at 42, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409. Rehnquist then reasoned that Santana could not thwart her lawful arrest "by the expedient of escaping to a private place." *Santana*, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410. He concluded that the officers' entry into the home was justified because the police were in "hot pursuit." Rehnquist also noted that, once Santana saw the police, the officers had a legitimate fear that any delay would result in the destruction of evidence. *Santana*, 427 U.S. at 43, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410.

Justice White, while joining the majority, wrote separately to express his belief that a warrantless entry into a home was justified whenever the police had probable cause to arrest and probable cause to believe that the offender was inside the home, as long as "entry by force was not required." *Santana*, 427 U.S. at 44, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410 (White, J., concurring).

In another separate concurrence, Justice Stevens, joined by Justice Stewart, expressed the belief that, because there had been probable cause which would have been sufficient to obtain a warrant, the officers' failure to obtain a warrant was "a justifiable police decision,

and *** even if not justifiable, harmless." *Santana*, 427 U.S. at 44, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410 (Stevens, J., concurring, joined by Stewart, J.). Justice Stevens explained that the police decision to make a warrantless arrest was justified because of the "significant risk" that the marked money would no longer be in Santana's possession if the police had waited for a warrant. In addition, it was harmless because the officers could have waited outside the home while a warrant was obtained, but when Santana came into "plain view" the warrantless arrest was justified before a warrant could be procured. *Santana*, 427 U.S. at 45, 49 L. Ed. 2d at 306, 96 S. Ct. at 2410 (Stevens, J., concurring, joined by Stewart, J.).

Justice Marshall, joined by Justice Brennan, dissented. In Justice Marshall's view, a warrantless arrest is never justified absent exigent circumstances. While he agreed that in the case before the court an exigency existed, *i.e.*, the likelihood that evidence of a crime would be destroyed, he believed this exigency was "produced solely by police conduct." *Santana*, 427 U.S. at 45, 49 L. Ed. 2d at 307, 96 S. Ct. at 2411 (Marshall, J, dissenting, joined by Brennan, J.). Justice Marshall pointed out that, because the undercover officer did not take McCafferty to a more remote location before arresting her, her arrest made it necessary for other officers to rush to Santana's home for fear that word would get back to Santana and she would dispose of the marked bills. For this reason, the dissenters would have remanded the matter for further proceedings to determine whether the decision to arrest McCafferty so close to Santana's house had been a deliberate attempt to create an exigency so as to circumvent the warrant requirement.

Despite the variations in viewpoint, what can be gleaned from the majority and separate opinions in *Santana*, including the dissent, is that a warrantless, nonconsensual entry into a private dwelling to effectuate a *felony* arrest will not violate the fourth amendment prohibition against unreasonable searches and seizures if the arresting officers have probable cause to arrest and the officers' entry onto private property is reasonable in light of the attendant circumstances. At a minimum, entry onto private property to effectuate a warrantless arrest will be reasonable if (1) probable cause to arrest exists prior to the entry onto private property, and (2) the attendant circumstances include an element of exigency that justifies the decision to proceed

without waiting to obtain a warrant. See also *Payton v. New York*, 445 U. S. 573, 583-90, 63 L. Ed. 2d 639, 649-53, 100 S. Ct. 1371, 1378-82 (1980) (probable cause plus exigent circumstances are required before police may make a warrantless, nonconsensual entry into a dwelling to conduct a search or seizure).

Turning to the case at bar, the facts reveal that Officer Dawdy made a warrantless, nonconsensual entry into the home of Patricia Foiles and thereafter arrested defendant Wear on a charge of driving under the influence (DUI)) (625 ILCS 5/11–501(a)(2) (West 2000)), a misdemeanor. Defendant argues in his brief that there are important distinctions between the case at bar and *Santana* because here the arresting officer's subjective intent for entering the residence was to conduct a *Terry* stop regarding the misdemeanor offense of DUI, not to effectuate a felony arrest. He asks this court to make clear that, even if an officer is in "hot pursuit" and the suspect escapes to a private place, a police officer is not entitled to enter that private place to conduct an investigatory stop based on a reasonable suspicion that the suspect has committed a crime, particularly where, as here, the suspected offense is not a felony.

The majority finds that, from an objective viewpoint, Officer Dawdy had probable cause to arrest defendant for DUI prior to the officer's entry into the home. Thus, although Officer Dawdy's subjective belief was that he was entering the residence to conduct a *Terry* stop, that subjective belief is not controlling. The majority makes clear that "were objective indicia of probable cause absent in this case, Officer Dawdy's entry into the residence to merely conduct an investigatory *Terry* stop would have violated the fourth amendment." Slip op. at 17.

I agree with the majority that, from an objective standpoint, Officer Dawdy's reasonable suspicion that defendant had been driving while intoxicated ripened into probable cause to arrest for DUI while the officer stood on the threshold of the Foiles residence. My concern, however, is not with the majority's treatment of the probable cause inquiry. Rather, I believe that the majority errs and fundamentally alters fourth amendment law when, in determining whether an exigency exists, it considers whether the circumstances constitute "hot pursuit" without regard to the seriousness of the underlying offense

and fails to assess the reasonableness of Officer Dawdy's conduct in light of the totality of the circumstances.

In the case at bar, the majority determines that the circumstances in this case constitute "hot pursuit"and then concludes that the exigent-circumstances requirement for an officer's warrantless, nonconsensual entry into private premises (*Payton v. New York*, 445 U.S. 573, 583-90, 63 L. Ed. 2d 639, 649-53, 100 S. Ct. 1371, 1378-82 (1980)) was satisfied. See slip op. at 20 ("[Dawdy's] warrantless, nonconsensual entry into Foiles residence was excused under the doctrine of hot pursuit"). In so doing, the majority relies on *Santana* without acknowledging that in *Santana* the officers were attempting to apprehend a fleeing felon. The majority fails to recognize that the seriousness of the underlying offense is part of the calculus for determining whether exigent circumstances exist. For this reason, I believe the majority's analysis is incomplete.

In determining whether a particular governmental action violates the fourth amendment, a court must evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests. *Wyoming v. Houghton*, 526 U.S. 295, 143 L. Ed. 2d 408, 119 S. Ct. 1297 (1999); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 652-53, 132 L. Ed. 2d 564, 574, 115 S. Ct. 2386, 2390 (1995). In general, a warrantless arrest by a police officer will be reasonable for fourth amendment purposes if the officer has probable cause to believe that the person has committed or is committing a criminal offense. However, warrantless searches or seizures occurring inside the home are presumptively unreasonable (*Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380 (1980)). Thus, if an officer possessing probable cause to arrest has no warrant, he may enter into a private residence to effectuate an arrest only if exigent circumstances exist that will excuse the warrant requirement. In other words, exigent circumstances may substitute for the warrant requirement. However, when deciding whether exigent circumstances exist, the seriousness of the crime involved is a factor to be considered. See *People v. Foskey*, 136 Ill. 2d 66 (1990) (one of the factors that may be taken into

account in assessing exigency in a particular situation is whether a grave offense is involved).

In the case at bar, the majority opinion finds that the officer's warrantless entry into the private residence to effectuate defendant's arrest was justified because the officer had probable cause to arrest and he was in "hot pursuit." Nothing in the majority's opinion would suggest that the seriousness of the underlying offense played any role in determining whether exigent circumstances existed in this case. I cannot agree with this approach. In my view it is overly broad and serves to erode the important privacy protections guaranteed by the fourth amendment. See N. Vaughan, *Overgeneralization of the Hot Pursuit Doctrine Provides Another Blow to the Fourth Amendment in Middletown v. Flinchum*, 37 Akron L. Rev. 509, 528 (2004) (when reviewing a warrantless arrest for reasonableness, if a court does not take into consideration the severity of the crime for which the defendant is being pursued, the court abandons the balancing test, resulting in "the right to privacy being permanently outweighed in the realm of hot pursuit").

In *Welsh v. Wisconsin*, 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984), the Supreme Court found that a warrantless entry into a home to arrest the defendant for DUI violated the fourth amendment due to a lack of exigent circumstances. The Court held:

> "Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. See *Payton v. New York*, *supra*, at 586. When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Welsh*, 466 U.S. at 750, 80 L. Ed. 2d at 743, 104 S. Ct. at 2098.

The *Welsh* Court also noted that "[e]ven the dissenters in *Payton*, [while] believing that warrantless home arrests [were] not prohibited by the Fourth Amendment, recognized the importance of the felony limitation on such arrests." *Welsh*, 466 U.S. at 750 n.12, 80 L. Ed. 2d at 743 n.12, 104 S. Ct. at 2098 n.12, citing *Payton*, 445 U.S. at 616-17, 63 L. Ed. 2d at 669, 100 S. Ct. at 1395 (White, J., dissenting, joined by Burger, C.J., and Rehnquist, J.) ("The felony requirement guards against abusive or arbitrary enforcement and ensures that invasions of the home occur only in case of the most serious crimes"). See also *McDonald v. United States*, 335 U.S. 451, 93 L. Ed. 153, 69 S. Ct. 191 (1948) (a finding of exigent circumstances to justify a warrantless home entry should be severely restricted when only a minor offense has been committed).

Importantly, *Welsh* did not hold that a warrantless entry into a dwelling will be valid only if the offense for which the defendant was arrested is a felony. Rather, the Court held:

> "We therefore conclude that the common-sense approach utilized by most lower courts is required by the Fourth Amendment prohibition on 'unreasonable searches and seizures,' and hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. Moreover, although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, see *Payton*, application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Welsh*, 466 U.S. at 753, 80 L. Ed. 2d at 745, 104 S. Ct. at 2099.

In *Welsh*, the warrantless entry into the defendant's home occurred late at night after the police found a recently abandoned car and were told by a witness that the driver of the car had swerved off the road and then walked off, appearing to be either sick or inebriated. The police checked the registration inside the car and determined that the owner of the car lived a short distance away. They went to the home without first obtaining a warrant, found defendant asleep inside his bedroom, and arrested him for driving while intoxicated. When the

defendant challenged the lawfulness of his arrest, the Wisconsin Supreme Court upheld the arrest, finding a "co-existence of probable cause and exigent circumstances" justified the warrantless entry into the home. The exigent circumstances that the state court relied upon were the hot-pursuit doctrine, the threat to public safety, and the need to preserve evidence of the petitioner's blood-alcohol level.

On review,[4] the United States Supreme Court found that none of the proffered reasons for making a warrantless entry constituted exigent circumstances under the facts of the case. The *Welsh* Court held:

> "The State attempts to justify the arrest by relying on the hot-pursuit doctrine, on the threat to public safety, and on the need to preserve evidence of the petitioner's blood-alcohol level. On the facts of this case, however, the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime. Moreover, because the petitioner had already arrived home, and had abandoned his car at the scene of the accident, there was little remaining threat to the public safety. Hence, the only potential emergency claimed by the State was the need to ascertain the petitioner's blood-alcohol level.
>
> *** The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. See Wis. Stat. §346.65(2) (1975); §346.65(2)(a) (Supp. 1983-1984); *supra*, at 746. This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest. See n.6, *supra*. Given this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant. To allow a warrantless home entry on these facts would be to

_____

[4]The Court did not consider whether there had been probable cause because the defendant never challenged the finding by the state courts below that probable cause existed.

approve unreasonable police behavior that the principles of the Fourth Amendment will not sanction." *Welsh*, 466 U.S. at 753-54, 80 L. Ed. 2d at 745-46, 104 S. Ct. at 2099-2100.

A majority of the jurisdictions that have considered the matter have limited *Welsh*'s restriction on warrantless arrests to nonjailable offenses and, thus, have held that exigent circumstances may exist when there is probable cause to believe that a misdemeanor, rather than a felony, has been committed. See *People v. Thompson*, 38 Cal. 4th 811, 822-23, 135 P.3d 3, 10, 43 Cal. Rptr. 3d 750, 758-59 (2006) (and the cases cited therein).

Here, the majority distinguishes *Welsh* on the grounds that, under Wisconsin law, a first DUI offense was a nonjailable, civil offense, whereas, in Illinois, a DUI conviction is a more serious misdemeanor, punishable by up to 364 days in jail. Slip op. at 19. However, the majority does not treat the seriousness of the offense as a factor in its determination of whether exigent circumstances exist.

Nor does the majority, having found exigent circumstances to exist, look at the reasonableness of the officer's actions in light of the totality of the circumstances. In my view, we should reaffirm our decision in *Foskey* and hold that a determination that a warrantless arrest is reasonable in a certain case cannot be made without looking at the totality of the circumstances that led up to the police officer's decision to make a warrantless entry into a dwelling. See *Foskey*, 136 Ill. 2d at 75-76 (In determining whether the police acted reasonably, the court must look to the totality of the circumstances confronting the officers at the time the entry was made. The circumstances must militate against delay and justify the officers' decision to proceed without a warrant. The guiding principle in such cases is reasonableness, and each case must be decided on its own facts); see also *Brigham City v. Stuart*, 547 U.S. 398, 164 L. Ed. 2d 650, 126 S. Ct. 1943 (2006) (wherein the Court, after finding exigent circumstances, looked to the reasonableness of the officers' action under the totality of the circumstances).

Although I find the majority's analysis lacking for the above reasons, I agree with the majority that exigent circumstances existed that rendered Officer Dawdy's entry into the Foiles residence reasonable and defendant's subsequent warrantless arrest lawful. Officer Dawdy had probable cause to arrest defendant for DUI at a

time when defendant was standing just inside the threshold of the Foiles residence–a place considered "public" in *Santana*. Thus, a lawful arrest could have been made at that time and defendant could not thwart his lawful arrest by the expedient of walking into the private residence. See *Santana*, 427 U.S. at 42-43, 49 L. Ed. 2d at 305, 96 S. Ct. at 2409-10.

Further, based on the manner in which "hot pursuit" has been defined (see *Santana*, 42 U.S. at 43, 49 L. Ed. 2d at 305, 96 S. Ct. at 2410), Officer Dawdy was in "hot pursuit" of defendant when he entered the Foiles residence. "Hot pursuit" requires some indication of a chase. That is, the evidence must show that the defendant was aware that he was being pursued by the police and that the defendant retreated, or "fled," from a public place to a private place to escape or avoid arrest. Clearly, the evidence in the case at bar meets this criteria.

When defendant got out of his car and proceeded toward the residence, Officer Dawdy pulled up behind defendant's car and repeatedly demanded that defendant stop and remain by his vehicle. Officer Dawdy also followed defendant to the door of the residence, where defendant spoke with Officer Dawdy, stating that he had "made it home." Officer Dawdy asked defendant for his identification, but defendant refused to comply and retreated further into the home. Defendant was aware that Officer Dawdy was asking for his identification as a preliminary to arresting him. Defendant's retreat into the home was to avoid that arrest. Furthermore, although the offense for which defendant was arrested was a misdemeanor and not a felony, DUI in Illinois is a jailable offense and, for that reason, is sufficiently serious to justify the officer's entry into the home to effectuate the arrest.

Finally, I would find that, under the totality of the circumstances, Officer Dawdy acted reasonably. Although entry into the home was nonconsenual, it was made peaceably. Officer Dawdy did not have to break down doors or use a show of force–he simply followed defendant into the residence. Accordingly, I would find that Officer Dawdy was not required to refrain from entering the home or attempt to obtain a warrant before arresting defendant. For these reasons, I agree with the majority's ultimate determination that defendant's arrest was lawful and thus I would also affirm the defendant's conviction.

JUSTICES FREEMAN and KILBRIDE join in this special concurrence.